**Andrew Ellsworth MORGAN**

v.

**DISTRICT OF COLUMBIA,**
**Appellant (Two Cases).**

**Nos. 85–5331, 85–5709.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 15, 1986.
Decided July 21, 1987.

Charlotte Brookins-Pruitt, Asst. Corp. Counsel, with whom John H. Suda, Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for appellant in Nos. 85-5331 and 85-5709.

Stephen L. Braga, with whom Randall J. Turk, Washington, D.C., was on the brief, for appellee in Nos. 85-5331 and 85-5709.

Before MIKVA, STARR, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

Dissenting opinion filed by Circuit Judge STARR.

MIKVA, Circuit Judge:

This is an appeal from a jury verdict that awarded Andrew Ellsworth Morgan, a former inmate of the District of Columbia Jail (the Jail), $75,000 in damages for injuries he sustained in a fight with another inmate while incarcerated at the Jail. Morgan had sued the District of Columbia, alleging negligence and violations of 42 U.S.C. § 1983 in the District's failure to protect him from his aggressor. Morgan's claims were premised largely on severe overcrowding at the Jail. At the close of all the evidence in the trial, the court denied the District's motion for a directed verdict. After the jury rendered verdicts in favor of Morgan on both claims, the district court denied the District's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The court then awarded most of the attorney's fees and costs Morgan's counsel had requested. The District challenges all of these rulings. Finding no merit in appellant's arguments, we affirm.

## I. Background

This case has its origins in the conditions of the District of Columbia's jails generally and, in particular, of the Jail at which Morgan was confined at the time of the assault. Overcrowding has been a persistent, systemic problem in the District's prison facilities and has been the subject of continuous litigation for over fifteen years. The District built the Jail at which appellee Morgan was housed only after considerable prodding from the federal courts to ease the overcrowding problem in the old detention facility, in which conditions were notoriously appalling. See Campbell v. McGruder, 580 F.2d 521, 533-35 (D.C.Cir. 1978). The new Jail, which houses both pretrial detainees and convicted prisoners, is designed exclusively for single-celling and has a rated single-cell capacity of 1,355

inmates. From the time the first sections of the Jail were opened in April of 1976, the district court has monitored inmate conditions.

For a time after the opening of the Jail, the District was able to keep the inmate population at, or at least close to, its rated capacity. By early 1981, however, the District found it necessary almost every evening to bus inmates from the Jail, where they stayed during the day, to penal facilities in Lorton, Virginia, where they slept. Such temporary solutions soon became insufficient to keep the Jail anywhere near its rated capacity, and by late 1981, the District was housing a large number of inmates in makeshift dormitories in the common areas of the Jail, as a result of which dayrooms could no longer be used for inmate recreation.

By October of 1982, the Jail population was more than 2,000 and growing at an average of over nine inmates a week. In light of the District's representation that overcrowding at the Jail had reached emergency proportions, the district court reluctantly permitted the District to institute double-celling as a temporary relief measure. However, in compliance with the constitutional requirements set forth in *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979), the court established certain conditions on the use of double-celling with regard to pretrial detainees. *See Campbell v. McGruder*, 554 F.Supp. 562 (D.D.C.1982). Two months later, the court ordered the District to develop a plan to eliminate overcrowding in its detention facility. *See Campbell v. McGruder*, C.A. No. 1462–71 (D.D.C. Dec. 17, 1982).

The District failed to take remedial action, and the inmate population continued to swell. In May of 1983, the District's Assistant Director for Detention Services testified before the district court that overcrowding at the Jail had reached the "danger point." By June of 1983, when Morgan's injuries occurred, the Jail's inmate population passed 2,300, exceeding the rated capacity by more than 75%. That month, the district court declared that conditions at the Jail had reached "the point of crisis," and, frustrated with the District's continual unresponsiveness ordered the District to show cause why it should not be held in contempt. *See Campbell v. McGruder*, C.A. No. 1462–71 (D.D.C. June 27, 1983). On July 22, 1983, one month after Morgan had sustained his injuries, a riot did occur in the Jail, and order was not restored until the arrival of large numbers of policemen and guards armed with shotguns. In September, the district court found that the District had deliberately failed to obey its orders concerning overcrowding at the Jail and held the District in civil contempt. *See Campbell v. McGruder*, C.A. No. 1462–71 (D.D.C. Sept. 30, 1983).

On June 26, 1983, the day the assault occurred, Morgan was housed in the Southeast-Three unit of the Jail. Southeast-Three was a medical unit designed to accommodate inmates suffering or recuperating from medical problems. Southeast-Three was considered an "open population" unit; inmates were confined to their cells (or their bunks) only during meals and count times. The unit contained 80 cells and was, accordingly, designed to hold 80 inmates. The unit also contained two TV rooms and four dayrooms. On June 26, Southeast-Three housed approximately 120 inmates: 78 inmates were assigned to individual cells, and the remaining 42 inmates were assigned to three areas that had formerly served as two dayrooms and a gymnasium. Morgan, who was serving a sentence for a second degree burglary charge, was assigned to one of the dayrooms in which bunk beds had been placed.

Southeast-Three was staffed by three correctional officers. One officer was stationed at all times in the "bubble," a glass enclosed unit from which the officer can observe the entire cellblock. The other two officers patrolled the cellblock. Correctional Officers Smith, Harrison and Delegal were on duty in the unit at the time of the assault.

In addition to its role as a medical cellblock, Southeast-Three also served as an "overflow" ward for the Jail's mental

health unit, South-Three. The forensic unit was intended to house those inmates who posed danger to themselves or others and who needed psychiatric care and supervision. South-Three differed from Southeast-Three in several significant respects. The inmate population in South-Three was restricted to 80 inmates who were kept locked-down in their cells during most of the day; no inmates were housed in open areas. The unit was more closely guarded than Southeast-Three: whereas there was 1 guard for every 40 inmates in Southeast-Three, there was 1 guard for every 20 inmates in South-Three. In addition, eight to ten medical technicians were on permanent assignment to South-Three. When there was insufficient space in South-Three, inmates who normally would have been housed there were shunted over to Southeast-Three.

The fight between Morgan and Donnell Hurt, who was also assigned to Southeast-Three, occurred on Sunday, June 26, 1983. After dinner that night, Morgan left his bunk in the dayroom and headed upstairs to the TV room with a jar of peanut butter and jelly which he had purchased in the canteen, several slices of bread he had saved from earlier meals, and a previously prepared sandwich. As Morgan neared the stairs, Hurt approached him and demanded a sandwich. Morgan refused, and a loud argument ensued. After a few minutes, Officer Delegal went to the top of the stairs and told the two men to stop arguing. Hurt then snatched the bread from Morgan's hand, touching Morgan's sandwich in the process, which provoked Morgan to throw the sandwich in the trash can. When Hurt grabbed for the jar, Morgan spit into it. Hurt, who had psychiatric problems as well as a history of physical violence, then punched Morgan in the face with his fist and began to pummel him about the face and body, as other inmates gathered around to watch.

There are two theories as to what motivated the altercation. One explanation is that it concerned the sandwich. The other theory was advanced by prisoner Kim Fleming at trial; Fleming testified that Hurt really wanted a sexual favor, not food, from Morgan on the night of the fight. Morgan, who was an admitted bisexual and known to be so throughout the cellblock, testified that he had had contact with Hurt on one other occasion several days before the fight, when Hurt approached him sexually and Morgan refused his advances.

The testimony at trial conflicted as to where the guards were positioned at the time the fight broke out, whether they intervened to stop the fight, and how long they took to do so. According to the guards, Officer Delegal succeeded in separating Morgan and Hurt after a few blows were landed, but the two inmates soon started shoving and hitting each other again. By this time, Officer Harrison, who had been standing beside the bubble when the argument started, had been attracted to the top of the stairs by the rush of inmates to the site. As Delegal strained to hold off Hurt, Harrison tried to get Morgan up the stairs, but Morgan resisted. Hurt then broke away and swung at Morgan, hitting Harrison in the shoulder instead and knocking the officer aside. The fighting resumed with added intensity until Harrison succeeded in getting Morgan up the stairs and behind the locked doors of the sally port. Various witnesses testified that the entire incident lasted between five and fifteen minutes. During the fight, Officer Smith remained in the bubble. Morgan testified that he was not personally aware that Smith did anything. He believed, however, that the officer notified the additional forces that usually assist in breaking up a prolonged fight not to come to the assistance of Delegal and Harrison.

After the fight, Morgan was taken to the infirmary. Thereafter, he was transported to D.C. General Hospital where he received three stitches to his left eye and four stitches to his chin. Morgan had also broken a molar, but because a dentist was not on duty at the hospital, he was given pain killers and told to return the following day. Morgan spent the night in administrative segregation with what felt like a broken jaw. The following day, Morgan had difficulty getting the authorities to return him

to the hospital, so he flooded his cell to get attention, prompting the guard on duty to move him to another unit. Morgan then cut his arm in order to obtain medical attention. It was not until Morgan was taken to the infirmary and a doctor examined his chart, that any prison authority acknowledged that Morgan was supposed to return to the hospital for further treatment. At the hospital, the dentist extracted his molar.

About ten days later, Morgan went to the infirmary complaining that he was experiencing blurred vision in his left eye. An examination did not reveal any evidence of damage to the eye. Morgan has continued, however, to have vision problems. A physician who examined Morgan in preparation for trial testified that he believed that Morgan was likely to develop a cataract as a result of Hurt's blows to his left eye and that the cataract could lead to a permanent loss of vision.

A few weeks after the fight, Morgan filed a *pro se* complaint with the district court claiming that his constitutional rights had been violated. After reviewing the complaint, the court appointed counsel who filed an amended complaint alleging a variety of legal claims against the District and its employees. The district court dismissed Morgan's claims against Mayor Marion Barry, Jr., Director of Corrections James Palmer, and the Jail Administrator, Jessie Jones, because these defendants had not been personally involved or implicated in the incident. After protracted discovery and extensive motions proceedings, the case was set for trial on the following claims: 1) a section 1983 claim that Officers Delegal, Harrison, and Smith had violated Morgan's eighth amendment right to be free from cruel and unusual punishment by failing to reasonably protect him from Hurt's assault; 2) a section 1983 claim that the District had violated Morgan's eighth amendment right in its operation of the Jail by failing to take reasonable precautions against Hurt's assault; 3) a pair of negligence claims tracking the two claims discussed above; and 4) a section 1983 claim that Lieutenant Robinson, a correctional officer at the Jail, had violated Morgan's

constitutional right to due process through his improper handling of Morgan's post-assault administrative complaints against Hurt.

As the trial progressed, the majority of Morgan's claims were dismissed. After the first day of trial, Morgan voluntarily dismissed his claim against Officer Smith. After the close of Morgan's case, the district court directed a verdict for defendants Delegal and Harrison. Finally, at the conclusion of the four and one-half day jury trial, the court directed a verdict in favor of Lieutenant Robinson. The court denied the District's motion for directed verdict. *See Morgan v. District of Columbia,* 603 F.Supp. 254 (D.D.C.1985) (Order). At the conclusion of all the evidence, therefore, only Morgan's section 1983 and negligence claims against the District remained in the case.

After two hours and thirty-five minutes of deliberations, the jury returned separate verdicts for Morgan on both claims, specifically finding that Morgan was not contributorily negligent as to either claim. On the negligence claim, the jury awarded Morgan $50,000; on the section 1983 claim, it awarded him $75,000. The district court entered the higher of the two verdicts against the District. The court subsequently denied the District's motion for judgment notwithstanding the verdict, or alternatively, for a new trial. This appeal followed.

Appellant raises three main arguments on appeal. First, the District challenges the district court's denial of its motion for a judgment *non obstante veredicto* (judgment n.o.v.), contending that the evidence cannot support the verdicts against the municipality. Second, the District avers that the district court committed reversible error in allowing the jury to hear certain evidence and therefore improperly denied its motion for a new trial. Finally, appellant charges that the district court awarded attorney's fees to which Morgan's counsel is not entitled. We examine each argument in turn.

## II. Judgment Notwithstanding the Verdict

Although the District has appealed the jury's verdicts for Morgan on both his claims, we need not necessarily resolve the merits of both verdicts. The district court entered only the jury's favorable verdict on his constitutional claim; consequently, if we uphold the court's award on this claim, we need not reach the merits of the jury's verdict on Morgan's negligence claim. Accordingly, the immediate question before us is whether the district court erred in denying the District's motion for judgment n.o.v. on Morgan's section 1983 claim.

█ For the District to prevail, it must show that the verdict of the jury was fatally flawed on either the evidence or the law which the judge directed the jurors to apply to the evidence. Because the jury has been ensconced in such a pivotal place in the American justice system, its decisions are given the utmost of deference and respect.

### A. Standard of Review

█ In reviewing a motion for judgment n.o.v., we apply the same standard that the trial court must apply in its initial consideration of the motion. *See Carter v. Duncan Huggins, Ltd.*, 727 F.2d 1225, 1227 (D.C.Cir.1984). Because such a judgment intrudes upon the jury's domain, the standard for granting a judgment n.o.v. is strict. *See Murphy v. United States*, 653 F.2d 637, 640 (D.C.Cir.1981). The jury's verdict must stand unless "the Court, after viewing all of the evidence, together with all inferences reasonably to be drawn, in the light most favorable to the successful party, determines that the evidence is so overwhelmingly in favor of the other party that reasonable men could not disagree." *Boutros v. Riggs National Bank, D.C.*, 655 F.2d 1257, 1258 (D.C.Cir.1981). *See also Carter*, 727 F.2d at 1227. A judgment n.o.v. should be entered only if "there can be but one reasonable conclusion" drawn from the evidence. *Foster v. Maryland State Savings and Loan Ass'n*, 590 F.2d 928, 930 (D.C.Cir.1978), *cert. denied*, 439 U.S. 1071, 99 S.Ct. 842, 59 L.Ed.2d 37 (1979). If fair-minded people might differ as to the appropriate conclusion, the motion must be denied. "It is the essence of the jury's function to select, from among conflicting inferences and conclusions, that which it finds most reasonable." *Metrocare v. Washington Metropolitan Area Transit Authority*, 679 F.2d 922, 925 (D.C. Cir.1982) (citing *Schulz v. Pennsylvania Railroad*, 350 U.S. 523, 526, 76 S.Ct. 608, 610, 100 L.Ed. 668 (1956)).

In reviewing the motion, we may not weigh the evidence; we are required to evaluate the evidence under the presumption that the jury resolved all factual disputes in favor of the prevailing party. Moreover, we must give the advantage of every fair and reasonable inference to the prevailing party. Finally, we may not assess the credibility of the witnesses; that function is reserved exclusively for the jury. Our function is limited to verifying "only that fair-minded jurors could reach the verdict rendered." *Grogan v. General Maintenance Service Co.*, 763 F.2d 444, 447 (D.C.Cir.1985) (citations omitted).

### B. Substantive Law

This case arises under section 1983 of the Civil Rights Act of 1871, which provides a remedy for a citizen deprived of his constitutional rights by another person acting under the color of state law. *See* 42 U.S.C. § 1983 (1982); *see also* Pub.L. 96–170, 93 Stat. 1284 (1979) (extending section 1983 to citizens of the District of Columbia). The roots of section 1983 go back to the Civil War, reflecting Congress' desire to provide a federal remedy against anyone using the power of state law to impinge on rights protected under the federal Constitution. While section 1983 has reaped its share of criticism for encouraging federal intervention in local affairs, it remains on the books as the workhorse of civil rights litigation. It has been widely invoked by inmates of state and local jails to obtain the kind of relief sought here.

Morgan's complaint alleged that the District violated his eighth amendment right to be free of cruel and unusual punishment. Specifically, Morgan averred that the District was deliberately indifferent to the

need to protect him from attack and injury by Hurt, thereby violating his constitutional right to be kept reasonably safe from assault and injury. Morgan contended that the historic and pervasive overcrowding of the Jail created problems of great magnitude and severity at the institution in June of 1983 (including the crowding of inmates into cramped quarters, inadequate guard staffing and supervision, improper inmate classification, and faulty assignment procedures) that both directly and indirectly caused Hurt's assault on him.

■ The eighth amendment, "which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners." *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986). Having incarcerated the individuals, stripped them of all means of self-protection, and foreclosed access to private aid, the state is constitutionally required to provide prisoners with some protection from the dangers to which they are exposed. *See Washington v. District of Columbia,* 802 F.2d 1478, 1481–82 (D.C.Cir.1986). Although the state is not obliged to insure an assault-free environment, a prisoner has a constitutional right to be protected from the unreasonable threat of violence from his fellow inmates. *See Murphy,* 653 F.2d at 644–45; *Jones v. Diamond,* 636 F.2d 1364, 1373–74 (5th Cir.1981); *Withers v. Levine,* 615 F.2d 158, 161 (4th Cir.), *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980).

■ The Supreme Court recently suggested that the standard by which an eighth amendment claimant can allege and prove the unnecessary and wanton infliction of pain varies with the kind of conduct against which the eighth amendment objection is lodged. *See Whitley,* 106 S.Ct. at 1084. An express intent to inflict suffering is never required. On the other hand, to constitute cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's safety; mere negligence will not suffice.

*See id.* Most often, "deliberate indifference" is sufficient. *See Estelle v. Gamble,* 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 ("deliberate indifference to a prisoner's serious illness or injury" violates eighth amendment); *Duckworth v. Franzen,* 780 F.2d 645, 652 (7th Cir.1985), *cert. denied,* —— U.S. ——, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986); *Murphy,* 653 F.2d at 644. In *Whitley,* however, the Court reasoned that sometimes the deliberate indifference standard does not adequately capture the importance of the competing institutional obligations to ensure the safety of prison staff and to take reasonable steps to protect inmates; nor does it "convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Id.* 106 S.Ct. at 1085. A majority of the Court concluded that a prison guard's decision to shoot an inmate during a riot was one such instance. The Court held, over strong dissent, that "in making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance ... that indisputably poses significant risks to the safety of inmates and prison staff," a constitutional violation can be established only if force was used "maliciously and sadistically for the very purpose of causing harm." *Id.* at 1084–85. The Court gave no indication of other conduct to which this heightened standard might apply.

■ Although the district court did not have the benefit of the Supreme Court's discussion in *Whitley,* we are convinced that the court correctly instructed the jury that the "deliberate indifference" standard applies to Morgan's claim. Indeed, the District does not dispute our conclusion. The exigencies and competing obligations facing prison authorities while attempting to regain control of a riotous cellblock, which led the Court to conclude that the "deliberate indifference" standard was inadequate in *Whitley,* are not present in this case. The gravamen of Morgan's claim is the District's overcrowding of the Jail; the conduct Morgan challenges is the municipality's operation of the Jail generally. In this

context, unlike in the prison riot setting, there can be no legitimate concern that liability will improperly be based on "decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Whitley,* 106 S.Ct. at 1085. The District's practice of prison overcrowding has endured at least since 1971. We therefore conclude that "deliberate indifference" was the appropriate standard by which to judge the District's conduct in this case. Accordingly, for Morgan to prevail, the jury was required to find that the District acted with deliberate indifference to its duty to protect Morgan from unreasonable risk of assault by another inmate on or about June 26, 1983.

The district court correctly instructed the jury on the "deliberate indifference" standard in this context. It stated:

> Deliberate indifference occurs if there is an obvious unreasonable risk of violent harm to a prisoner or a group of prisoners which is known to be present or should have been known, and the District through its employees who knew or should have known of the risk were outrageously insensitive or flagrantly indifferent to the situation and took no significant action to correct or avoid the risk of harm to the prisoner or prisoners who were subject to the unreasonable risk of violent harm.

*Cf. Murphy,* 653 F.2d at 644–45 (deliberate indifference can be inferred from evidence that danger was sufficiently obvious to apprise officials of need for protective measures and that officials failed to take such measures); *Duckworth,* 780 F.2d at 652–53 (comparing deliberate indifference to recklessness in the criminal law sense).

In addition, Morgan had to show that it was an official policy or custom or practice of the District to fail to take significant steps to prevent the known risk. A municipality may be held liable under section 1983 only when the execution of its official policy or custom is responsible for the deprivation of constitutional rights. *See Monell v. New York City Department of Social Services,* 436 U.S. 658, 690–94, 98 S.Ct. 2018, 2035–37, 56 L.Ed.2d 611 (1978);

*Murphy,* 653 F.2d at 644–45. The requisite showing is satisfied by demonstration that the deliberate indifference is a persistent and widespread practice or course of action that characteristically was repeated under like circumstances. *See Monell,* 436 U.S. at 691, 98 S.Ct. at 2036. Thus, the court correctly instructed the jury that:

> If you find that a known hazardous risk has been allowed to continue over time without doing anything significant to alleviate the risk, then you may, if you wish, conclude this custom or policy or practice exists.

In addition, liability requires a causal link between the municipality's custom at issue and the alleged constitutional deprivation. *See Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). A government may be held liable under section 1983 only when execution of its policy or custom inflicts the injury. Accordingly, the district court instructed the jury that Morgan must show that the District's violation of his eighth amendment right was a proximate cause of his injury. We turn then to consider whether this properly instructed jury could reasonably have found the District liable under the legal principles articulated above.

### C. *Analysis*

The record, taken as a whole and read in the light most favorable to Morgan, supports a finding that as a matter of practice, the District was deliberately indifferent to inmates' security in the operation of the Jail and that this practice caused Morgan's injury. The evidence compels us to agree with the district court's conclusion that a reasonable jury could have found that "the [District's] deviation from any reasonable standard of care was obvious and flagrant." Order at 3.

The jury heard testimony which could have led it reasonably to conclude that Donnell Hurt posed a serious danger to his fellow inmates and that the District knew or should have known of the risk of harm. The record discloses substantial evidence of Hurt's violent tendencies, to which Jail offi-

cials were privy. Hurt was a large man, about 6'2" and 220 pounds. At the time the fight occurred, Hurt had been in Southeast-Three for less than three weeks, yet several inmates testified that he was already known for his strength. Hurt was in Jail awaiting sentence on a first degree murder conviction; he had beaten a man, known to be a homosexual, to death. Prisoner Kim Fleming testified that the facts of Hurt's homicide were common knowledge to his fellow prisoners. In addition, Hurt's file contained evidence of his involvement in a major altercation while incarcerated at Lorton in September of 1978. The incident report, which was submitted to the jury, stated that Hurt had approached another inmate sexually, and when the other prisoner refused his advance, Hurt punched him in the face causing substantial injury. Of more immediate and serious nature, Fleming testified that, prior to the fight, Hurt had been pursuing a plan to kill another inmate in Southeast-Three. Fleming notified a sergeant at the Jail about Hurt's plan, and the prison authorities removed the threatened prisoner. Hurt, on the other hand, was allowed to remain in the open population unit.

The jury also considered evidence, all of which was known to prison staff, concerning Hurt's unstable mental condition at the time of the fight. Beginning in May of 1983, Hurt began to undergo treatment at the Jail for psychiatric problems, including anxiousness, depression, and insomnia. At the time, Hurt lived in Southeast-Two, another open population unit. He complained of extreme anxiety about his impending sentencing and claimed to hear a "soft sound like a voice" in his cell. Prison guards observed his unusual behavior and filed several reports to alert the medical staff. The head of the prison's psychiatric clinic, Dr. Papish, consulted with Hurt, gave him strong tranquilizing medication, scheduled another visit, and recommended that Hurt remain in his open population unit. Dr. Papish missed the scheduled revisit with Hurt. Shortly thereafter, three weeks before his attack on Morgan, Hurt attempted to hang himself. As a result, Jail officials transferred Hurt to the infir-

mary where he was locked down for observation. Dr. Papish and another psychiatrist visited Hurt in the infirmary and prescribed further medication and consultations. After several days, Dr. Papish determined that Hurt was no longer suicidal and recommended that he be returned to open population. Prison authorities then moved Hurt, for the first time, to Southeast-Three. Three days before the fight occurred, a psychiatrist again missed one of the scheduled repeat visits with Hurt. All of this evidence was more than sufficient to support a conclusion that the District knew or should have known of Hurt's instability and propensity for violence and of the risk of harm he posed to his fellow inmates.

Other evidence adduced at trial supports a conclusion that the reasonable course of action for Hurt would have been to confine him to the Jail's forensic unit, South-Three. Nurse Veech, who served on the psychiatric staff at the Jail's infirmary at the time, explained that under Jail procedures, prisoners with potential for violence were classified for assignment to South-Three, where they would be locked down and closely supervised. Morgan testified that after the fight he heard Nurse Veech exclaim to another nurse in the infirmary: "What is Resident Hurt doing in Southeast-Three? He's supposed to be in South-Three." (The trial judge instructed the jury that this information was not admitted for the truth of the statement.) According to Dr. Papish, the psychiatrists who treated Hurt were never made aware of Hurt's death threat to the other Southeast-Three inmate and never saw the unusual behavior reports regarding Hurt. Although he acknowledged that such information would be relevant to assessing Hurt's proper placement, Dr. Papish was unwilling to say that such knowledge together with Hurt's other history would have led him to recommend Hurt's placement in the lock-down facility. But a jury could reasonably conclude otherwise. The day after the assault, Dr. Papish spoke with Hurt and learned of the fight. Although he wrote "no change" on Hurt's psychiatric evaluation, he imme-

diately sent Hurt to South-Three. This late-coming decision to confine Hurt, when considered together with the other evidence, could have reasonably been taken by the jury as evidence that given Hurt's dangerousness and mental instability, it was unreasonable for the District to have placed him in the open population atmosphere of Southeast-Three.

The record shows that the jury could have further concluded that Hurt's presence in Southeast-Three on the day of the fight was a result of the District's established method of operating the Jail, which exposed inmates to unreasonable risk of harm. Nurse Veech testified that, because of the overcrowding at the Jail, "every day" she observed inmates who would normally have been kept in South-Three being housed instead in Southeast-Three. The nurse estimated that on an average, 40 percent of the prisoners in Southeast-Three should have been heavily medicated and locked down in South-Three, and that the percentage sometimes got as high as 65 to 75. The District, however, made no special arrangements for handling these "overflow" inmates. In addition, Donald Wood, an Administrative Officer of the D.C. Department of Corrections who logs statistical reports on the prison, explained that every prisoner, after his institutional history is reviewed, receives a numerical housing classification code which would determine his housing assignment, ranging from lock-down facilities to open population units. Despite this classification system, Southeast-Three housed residents who were assigned any of the various codes. Mr. Wood admitted that mixing inmates with different classification codes was not "a desirable practice." Dr. Papish described the Jail's hit-or-miss approach to the placement of inmates whom administrators consider "pretty ill and distressed and disturbed." He admitted that the "safe thing and most prudent thing" would be to put them in South-Three where there is extensive, constant supervision and control, but stated that those individuals might easily end up elsewhere, with unpredictable effects. From this testimony, the jury could reasonably have found that Hurt's assignment was the direct result of the District's common practice of knowingly or recklessly housing in Southeast-Three prisoners who, because of their potential for violence (or other considerations), belonged in the more restricted South-Three unit.

The jury could also reasonably have found that Hurt's placement in Southeast-Three, rather than South-Three, was the indirect result of the utter breakdown in procedures caused by the overcrowding of the Jail. The testimony presented at trial painted a vivid picture of a chaotic environment in which important documents were lost or never filed, serious incidents were overlooked or neglected, and care was woefully inadequate. Nurse Veech testified that "the overcrowding resulted in [the psychiatric staff] being unable to keep up with the number of people that were there. We were unable to keep up with the paper work, filing reports, getting them acted upon, having them seen by the psychiatrist. It was an overwhelming situation." Dr. Papish testified that he rarely saw all the patients scheduled for visitation on the days he was at the Jail, and that about 10 percent of the time he did see inmates, their files could not be found. No report of Hurt's plan to kill his fellow inmate was found in his file, and the incident report on the Morgan-Hurt fight, while Officer Delegal swore he completed, could not be located. A juror could easily infer that those in charge often did not know to which unit an inmate had been transferred, that the decision was made by any number of individuals and often on incomplete information, that a psychiatrist's recommendation as to prisoner assignment was not necessarily followed, and that problems were not attended to until a crisis erupted.

Morgan presented other evidence that would have given a reasonable juror further basis to conclude that the District knew or should have known that its persistent method of operating the Jail increased the risk of violent harm to inmates, and that the situation had reached crisis proportions by June of 1983. Moreover, the jury could have reasonably concluded that the District was outrageously insensitive or

flagrantly indifferent to the situation and took no significant preventive or corrective action. In addition to the raw statistics regarding the steadily increasing overcrowding of the facility, the jury heard testimony regarding the incidence of violence. The Assistant Director of the Jail believed that the Jail was "at or near the danger point" on May 24, 1983. The jury also heard that on July 22nd, there was a riot among Jail inmates. Although this evidence did not specifically pertain to Southeast-Three, it is relevant to the District's awareness of the overcrowding and its effects; the riot confirmed the predictions made one month prior to the fight (when the Jail was less overcrowded than in June) regarding the potential dangerousness of Jail conditions. Moreover, the Director's assessment and the subsequent confirmation highlight the District's failure to do anything to correct the known problem or prevent its anticipated violent consequences. The jury also heard evidence about the particular dangerousness of Southeast-Three. In June of 1983, the unit, while not as overcrowded as some other units, had an inmate population in excess of 50% of its rated capacity. Further, unlike other units, Southeast-Three was not double-celled; the District conceded that double-celling dramatically reduces the risk of inmate violence posed by housing inmates in open dormitories. Nurse Veech testified that fights occurred at least several times a week in the unit. From her additional testimony, the jury might have reasonably concluded that the number was substantially higher because not all fights resulted in an inmate's reaching the infirmary for treatment of injuries. Officer Harrison testified that on the day of the fight, he had commented that lately violence seemed to occur over the most trivial matters. A jury might reasonably infer from the record that the overcrowding, which had reached its peak in June of 1983, had severely increased tensions and hostilities among the inmates and prompted violent outbursts. Moreover, the long history of overcrowding, the prison officials' remarks about the anticipated and observed effects of the overcrowding, and the failure

of the District to alleviate the problem notwithstanding a direct court order to take corrective action, together support a finding that the District had a well-established practice of deliberate indifference to the threat of violence in the Jail.

The District's principal argument in opposition to the jury verdict is that without expert testimony it was improper to allow the jury to infer that there was an unreasonable risk of assault by other inmates in Southeast-Three in June of 1983. In particular, the District avers that the jury could not assess the adequacy of security arrangements at the Jail without expert testimony. The District in effect argues that the testimony of a prison expert is necessary in every case alleging failure to reasonably protect an inmate from harm. The district court specifically rejected this argument in denying the District's motion for directed verdict. The court concluded that "the facts in this case spoke eloquently for themselves and required no expert interpretation." Order at 4. As with so much of the administration of a trial, a trial judge has broad discretion in determining when expert testimony is necessary to aid the jury in its search for the truth. It is the trial judge's responsibility to put together the specifics which will create that special set of social dynamics we use to find the facts and apply the law to private and public disputes. And because the assessment of what is needed turns on a variety of factors readily apparent only to the trial judge, we must sustain his decision to permit the jury to decide the case without the aid of experts unless the decision was "manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). We are unwilling to disturb the district court's decision in the circumstances of this case.

The law *rarely* predicates recovery upon expert testimony, *see Salem*, 370 U.S. at 35, 82 S.Ct. at 1122, and we cannot locate such a predicate here. As a general matter, expert testimony is unnecessary

if all the primary facts can be accurately and intelligibly described to the jury and

if they, as men of common under-standing, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.

*Salem,* 370 U.S. at 35, 82 S.Ct. at 1122 (internal quotes and citations omitted). We are not insensitive to the special knowledge and experience demanded in making prison security arrangements. But even in such circumstances, there are many instances where the facts alone can prove unreasonableness and where it is unnecessary to have the opinions of experts in prison administration. We consider this to be one such instance. The events at issue in this case were not so far removed from the realm of common knowledge and everyday experience that the lay jury could not conclude that the conditions at the Jail in June of 1983 constituted cruel and unusual punishment; as the district court found, "[n]o subtleties were involved." Order at 3. "[G]eneralized opinions of experts cannot weigh as heavily in determining contemporary standards of decency as 'the public attitude toward a given sanction.'" *Rhodes v. Chapman,* 452 U.S. 337, 348 n. 13, 101 S.Ct. 2392, 2400 n. 13, 69 L.Ed.2d 59 (analyzing meaning of cruel and unusual punishment in context of prison conditions).

The cases on which the District relies for its *per se* expert rule involved analysis of specific, technical decisions made by prison authorities, the reasonableness of which was acknowledged to be outside the ken of the lay person. *See Murphy,* 653 F.2d at 651 (allegation of negligent classification of inmate); *Hughes v. District of Columbia,* 425 A.2d 1299 (D.C.1981) (failure to place inmate in protective custody); *Matthews v. District of Columbia,* 387 A.2d 731 (D.C. 1978) (location of correctional officials within the cellblock). Although the courts expressed a strong preference for expert testimony in such peculiar circumstances, they made clear that such testimony was not absolutely necessary to establish liability. In each case, the court stated that the plaintiffs could have established the inadequacy of care through supporting evidence

or some other showing. *Murphy,* 653 F.2d at 651 & n. 69; *Hughes,* 425 A.2d at 1303; *Matthews,* 387 A.2d at 734. Furthermore, this case, unlike the cases on which the District relies, did not involve an assessment of any one management decision, but rather challenged a course of conduct that included multiple factors, all of which the district court instructed the jury to consider in determining whether the District had acted with deliberate indifference to a known unreasonable risk of harm.

■ Without explicitly finding that the district court's decision was "manifestly erroneous," *Salem,* 370 U.S. at 35, 82 S.Ct. at 1122, our dissenting colleague suggests that without expert guidance, the jury was left to make unreasonable leaps of logic. *See* Dissenting Opinion at .1070–71. Apparently, our colleague embraces the District's view that the law requires expert testimony in cases where any small fraction of the issues presented to the jury involves prison security. We find it difficult to locate and follow the reasoning to foreclose the district court's broad discretion in this one kind of litigation when the traditional rule is exactly the opposite. The mere fact that prison security is normally left to the discretion of prison administrators does not, *a fortiori,* prevent the trial court from determining that a reasonable jury could conclude upon egregious facts that the administrators abused their discretion. Fears that a lay jury will be unable to assess the adequacy of such gross, obvious facts (as are present in this case) are not well-founded. We traditionally trust juries to make far more complex evaluations without the interposition of experts. Accordingly, we conclude that the district court's decision to permit the jury to reach its verdict without the benefit of expert testimony was not manifestly erroneous.

■ The District also asserts that there was insufficient evidence that its conduct was the proximate cause of Morgan's injuries. Under District of Columbia law, proximate cause is proved if the "conduct is a substantial factor in bringing about

harm." *White v. United States*, 780 F.2d 97, 106 (D.C.Cir.1986) (quoting *Morgan v. District of Columbia*, 449 A.2d 1102, 1111 (D.C.App.1982) (not related to this case), *vacated on other grounds*, 452 A.2d 1197 (D.C.App.1982), *aff'd*, 468 A.2d 1306 (D.C. App.1983) (en banc)). The defendant may be held liable for harm that is "foreseeably attributable" to his conduct as well as for unforeseeable harm attributable to his conduct, unless it appears that the chain of events is "highly extraordinary in retrospect." *Id.* As a general proposition, we have no difficulty finding that a reasonable person could conclude that overcrowding in prisons is a substantial factor in bringing about fighting among inmates. Indeed, in an earlier case involving the Jail, we observed that many courts "have recognized that overcrowding and double-celling are often *prime causes* of the tension, sexual assaults, denial of privacy, inadequate supervision and medical care ... that characterize so many jails and prisons." *Campbell*, 580 F.2d at 536 n. 27 (emphasis added). More specifically, from the facts articulated above, a reasonable juror could find it to be more likely than not that one or more of the many ramifications of the District's deliberate practice of overcrowding the Jail played a substantial part in Hurt's assault on Morgan. Moreover, the jury could reasonably conclude that Hurt's assault was foreseeable. Even if we were to hold that Morgan's injuries were unforeseeable, we would find nothing "highly extraordinary" about the jury's conclusion that the District's conduct resulted in Hurt's eventual assault upon Morgan.

In short, the record contains sufficient evidence from which the jury could have concluded that the serious potential threat Hurt posed to his fellow inmates, of which the District knew or should have known, was not properly avoided because the Jail's correctional system was strained to the breaking point by overcrowding and, consequently, was not functioning effectively. The record similarly supports a finding that the Jail's overcrowding was the result of the District's pervasive practices and that the District had taken no significant action to avoid the attendant risk of harm

to inmates. In sum, the jury could have reasonably concluded, under the totality of the circumstances, that the District was deliberately indifferent to the unreasonably risky conditions at the Jail and that this indifference was a substantial factor in the infliction of Morgan's injuries. We are aware that our dissenting colleague finds testimony favorable to Morgan not credible and weighs the evidence differently than did the jury; in reviewing the jury's verdict, however, we cannot indulge in such luxuries. While we as factfinders may or may not have drawn the same conclusion from the evidence, that evidence precludes us from saying that no reasonable juror could have reached the verdict rendered in this case. We conclude that the district court properly denied the District's motion for judgment n.o.v.

### III. MOTION FOR A NEW TRIAL

Appellant also requests a new trial on the ground that the district court made three erroneous evidentiary rulings. The District contends that each ruling permitted Morgan to introduce evidence whose probative value is substantially outweighed by its unfairly prejudicial impact, in contravention of Rule 403 of the Federal Rules of Evidence. The district court rejected the District's arguments in denying appellant's motion for a new trial. So do we.

Our review of a denial of a motion for a new trial, like our review of a denial of a motion for judgment n.o.v., is limited. The disposition of such a motion is a matter committed to the sound discretion of the trial court. *See Grogan*, 763 F.2d at 447. We review the district court's denial of a motion for new trial only for abuse of discretion. *See Vander Zee v. Karabatsos*, 589 F.2d 723, 728 (D.C.Cir.1978), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979). Our review is no less narrow when, as in this case, the motion is founded upon the contention that the court erred in permitting the jury to hear evidence whose unfair prejudice outweighed its probative value. The balancing of probative value against potential for unfair prejudice called for by Rule 403 is a task

specifically entrusted to the discretion of the district court. *See United States v. Weisz,* 718 F.2d 413, 431 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed. 688 (1984). We may disturb a trial judge's evidentiary decision "only upon a showing of grave abuse of discretion." *United States v. Perry,* 731 F.2d 985, 993 (D.C.Cir.1984). Since we cannot say that the district court abused its discretion in admitting the challenged evidence, we have no difficulty in concluding that the court did not abuse its discretion in denying the District's motion for a new trial.

▮ The District first challenges the trial court's admission of the following fact:

> On September 3, 1983, the U.S. District Court found that the District of Columbia government had deliberately failed to obey the court's orders concerning overcrowding at the D.C. Jail.

Appellant asserts that the probative value of the court order mentioned was marginal. According to the District, the relevant order in *Campbell v. McGruder, supra,* dealt with specific restrictions on double-celling of pretrial detainees, not on overcrowding "as such." The District avers that Southeast-Three was unique and that evidence of any general overcrowding and its effects elsewhere in the Jail has no relation to the unit at issue in this case. The District asserts that, by comparison, the prejudicial impact of the evidence was "immense."

The probative value of this evidence cannot be gainsaid. Even the most cursory examination of the *Campbell* litigation and the September court order shows that the institution-wide overcrowding of the Jail was the core issue. At the time, the District was under court order to alleviate the overcrowding generally, not just as to pretrial detainees. Although the evidence does not conclusively prove overcrowding in Southeast-Three, it tends to show the egregiousness of the overcrowding in the Jail generally. In addition, the evidence helps to establish the requisite deliberate indifference; it was introduced to strengthen the inference about the District's "state of mind" toward protecting Morgan against the unreasonable risk of harm—a crucial issue in the case. Moreover, it is relevant to whether the alleged indifference was a practice or custom of the municipality. Nor can we agree that the District was *unfairly* prejudiced by the court's admission of the evidence. The District complains that the evidence was likely to produce the impression that the District simply ignored its legal responsibilities with respect to the inmates of the Jail. Such an impression would clearly prejudice the District's case, but the impression is a fair one. The district court grounded its civil contempt order on a finding that the District had "a policy of bad faith, of disregard for the City's legal obligations, and of deliberate violations of the inmates' constitutional rights." *Campbell v. McGruder,* C.A. No. 1462–71, Order of Sept. 30, 1983, at 24. This finding was the culmination of ongoing proceedings before the court, during which the District continually begged off its obligation, reinforced by court order, to relieve the overcrowding at the Jail. In fact, one day after the fight, the court issued its order to show cause why this contempt order should not be entered against the municipality. *See Campbell v. McGruder,* C.A. No. 1462–71 (D.D.C. June 27, 1983). Accordingly, we conclude that the trial court did not abuse its discretion in permitting the jury to hear the evidence.

▮ The District also maintains that the district court erred in admitting evidence that a riot among inmates occurred at the Jail in July of 1983. Appellant contends that the evidence is of limited, if any, probative force because the riot did not involve Southeast-Three and occurred one month after the fight between Morgan and Hurt. Appellant views the evidence as highly prejudicial because it could give the impression that the entire Jail, including Southeast-Three, was rife with tensions and "like a powder keg waiting to explode."

Again, we cannot dispute the probativeness of this evidence. At issue in this case were the conditions at the Jail in June of 1983, the effect of those conditions on inmates (especially with respect to the risk of

violence), and the District's failure to prevent or avoid those effects. The riot, particularly when considered together with the Jail Director's testimony in May of 1983 that the Jail was at the "danger point," could aid the jury in assessing all of these issues. At noted earlier, the riot confirmed the Director's assessment of the dangerousness of the conditions present at the Jail immediately prior to the fight and indicated the dangerousness of the conditions in June of that year. *See generally* 2 Wigmore on Evidence, § 382 (Chadbourn Rev.1979) ("the prior or the subsequent existence of a ... condition is evidential of its existence at a given time"). In addition, the evidence went to the District's deliberate indifference in failing to avoid or prevent what it knew or should have known to be the serious risks posed by the conditions. We are therefore unwilling to disturb the district court's determination that any unfair prejudice to the District did not outweigh the probative value of the evidence.

█ Finally, the District challenges the court's admission of evidence that prison authorities had failed to discipline Hurt after the fight, and that Morgan had written to the Mayor without obtaining redress. Appellant contends that this evidence was totally irrelevant to the issue of the District's indifference to the risk of assault and could only serve to prejudice the District unfairly.

The District misperceives the intended use of this evidence. It was introduced to support Morgan's section 1983 claim in which Morgan alleged that he had been deprived of due process by the post-assault handling of various administrative complaints. The district court directed a verdict against Morgan on this claim at the close of all the evidence, and Morgan's counsel did not refer to the facts during closing argument. Any potential for unfair prejudice was plainly outweighed by the clear relevance of the evidence to the due process issue. We therefore find no abuse of discretion in the court's admission of this evidence.

## IV. ATTORNEY'S FEES

Following the district court's entry of judgment, Morgan filed an application for attorney's fees, requesting $90,242.93 in fees and costs, plus $7,125.12 as partial compensation for work done to prepare and prosecute the fees application. In support of the application, Morgan submitted an affidavit by counsel detailing and itemizing the claims and appending supporting data. Applying the standards articulated by the Supreme Court in *Hensley v. Eckenhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the district court excluded costs and fees related to Morgan's unsuccessful due process claim and made deductions for duplication of effort. The court then awarded Morgan's counsel $80,000 for the trial and $5,000 for the application and related papers. *See Morgan v. District of Columbia,* C.A. No. 83–3660 (May 3, 1985) (Fees Order).

Appellant seems determined to transform the fees application into a second major litigation, in disregard of persistent judicial admonitions that such results should be avoided, *see e.g., Commonwealth of Puerto Rico v. Heckler,* 745 F.2d 709, 713 (D.C.Cir.1984). Having vigorously opposed every aspect of the fees application below, the District pursues on appeal two objections it raised and lost before the district court. Appellant contends that the court improperly awarded fees for time spent on several "unsuccessful" claims and for allegedly "nonproductive efforts" by counsel. The District asks us to vacate the award and remand to the district court for recalculation. We decline the invitation.

A trial court's award of attorney's fees may be upset on appeal only if it represents an abuse of discretion. *See Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941; *Copeland v. Marshall,* 641 F.2d 880, 901 (D.C. Cir.1980). In *Copeland,* we explained the reasons for this sound policy.

We customarily defer to the District Court's judgment because an appellate court is not well situated to assess the course of litigation and the quality of counsel. The District Court judge, by contrast, closely monitors the litigation

on a day-to-day basis. The Supreme Court long ago observed that a trial judge "has far better means of knowing what is just and reasonable than an appellate court can have." Accordingly, we think "it is better to have th[e] discretion [to award fees] exercised by the court which has been most intimately connected with the case." 641 F.2d at 901 (citations and footnote omitted). In this case, the trial judge's award was specifically based upon his familiarity with the case after "presid[ing] at numerous motions, discovery disputes, and chambers conferences, as well as at the pretrial conference and trial." Fees Order at 1. We examine appellant's objections mindful that as an appellate court, we are ill-positioned to second guess the court's determination.

Title 42 U.S.C. § 1988 (1982) provides that in federal civil rights actions, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." In *Hensley*, the Supreme Court offered elaborate guidelines to trial courts regarding the proper calculation of awards under this provision. The Court instructed the trial courts to "focus on the significance of the overall relief obtained." *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. After observing that civil rights cases often involve a common core of complex facts and interrelated legal theories, the Court stated that when a plaintiff has obtained excellent results,

> the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of ... certain grounds is not sufficient reason for reducing a fee. The result is what matters.

*Id.* Fees for time spent on claims that ultimately were unsuccessful should be excluded only when the claims are "distinctly different" in all respects, both legal and factual, from plaintiff's successful claims. *Id.* at 434, 103 S.Ct. at 1940.

■ The District asserts that a number of claims on which Morgan did not prevail were distinct from the claims on which Morgan prevailed and that no fees should have been awarded for time spent litigating the former. Specifically, the District challenges fees related to the following claims: Morgan's claim that three Southeast-Three correctional officers conspired in violation of 42 U.S.C. §§ 1985 and 1986 not to render him aid during the assault out of fear for their own safety; Morgan's claims against defendants Barry, Palmer, and Jones; and Morgan's pleas for an injunction prohibiting the District from continuing certain conditions at the Jail and for a declaratory judgment that those conditions were unconstitutional. In concluding that the legal theory and core facts of these claims were not distinct from the theory and facts of Morgan's successful claim, the district court found that "[a]ll of plaintiff's efforts were directed to uncovering responsibility for his injury. Pursuit of one contention afforded discovery on another." Fees Order at 4. Given the breadth of the basis of Morgan's claims against the District, we cannot gainsay these conclusions. All of the unsuccessful claims challenged by appellant were related to Morgan's central claim that the District and its officers had been deliberately indifferent to Morgan's eighth amendment rights in connection with the assault by Hurt and that this indifference was rooted in the District's longstanding practice of overcrowding the Jail. The claims at issue clearly were not "distinct in all respects," *Hensley*, 461 U.S. at 440, 103 S.Ct. at 1943, from Morgan's central claim against the District, on which he achieved "outstanding" results. Fees Order at 2. Thus, the district court did not abuse its discretion in awarding fees for time spent researching and litigating these "unsuccessful" claims.

■ Appellant also argues that the attorney's fee award improperly included fees for three categories of time that the District contends were spent nonproductively: 1) time spent by Morgan's counsel securing and conferring with a correctional expert who did not testify; 2) time spent

during the trial by counsel's paralegal; and 3) time expended by counsel after trial communicating with the media, conferring with Morgan, and discussing the case with supervisors. The district court considered and rejected these claims, concluding that "counsel's time was efficiently expended." Fees Order at 5. In making this finding, the court commended the "dogged persistence of plaintiff's counsel when the District of Columbia from the outset threw every possible obstacle into the path of plaintiff's counsel and on some occasions even failed to afford counsel appointed by the Court elementary professional courtesy." Fees Order at 2. The district court closely monitored the course of this litigation and therefore is more aware than this court of the manner in which it was conducted and the productiveness of counsel's efforts. Counsel's efforts in the first category were spent preparing an expert witness to testify in rebuttal should the District call the correctional expert whom it had noticed as an intended witness. With regard to the second category of challenged time, counsel's paralegal took notes and otherwise assisted counsel at trial. We cannot find that the district court erred in including either category of time in the total number of hours reasonably expended on this litigation. As for the time expended on the miscellaneous activities listed in appellant's third category, Morgan has persuaded us that this time was not included in the fee request.

In light of the trial court's assessment of the overall success obtained by Morgan's counsel and the court's first-hand knowledge of the conduct of the litigation, the complexity of the case, and the skill exhibited by counsel, the court awarded Morgan attorney's fees and costs for time reasonably expended in this litigation. The District's tendentious and tenacious approach to challenging the court's determination has not convinced us that the court abused its discretion in this regard. Indeed, it has reconfirmed our conviction in the importance of heeding the Supreme Court's call for "conscientious effort" to resolve differences over fee awards reasonably, responsibly, and without precipitating another federal case. *See Blum v. Stenson,* 465 U.S. 886, 902 n. 19, 104 S.Ct. 1541, 1550 n. 19, 79 L.Ed.2d 891 (1984).

## V. CONCLUSION

The District maintains that the judgment in this lawsuit punishes it for its continued problems with overcrowding at the Jail, rather than providing a remedy to a prisoner wronged by the municipality. The weakness in this argument, and in the District's entire approach to this appeal, is its erroneous assumption that there is no connection between overcrowding and remedying Morgan's injury. In fact, the district court's judgment was based on the jury's finding that Morgan's constitutional rights were violated by the District as a result of the Jail's overcrowding, its attendant problems, and the reckless indifference of the District to those problems. The district court, exercising its judgment, allowed the jury to find from the "problems with overcrowding" that the District, as an established practice, acted with deliberate indifference to its duty to protect inmates from unreasonable risk of assault and that these actions caused Morgan's injury. The evidence adduced at trial supports this finding. Mindful of the wisdom in the traditional reluctance of an appellate court to interfere with the verdict of a properly instructed jury, we conclude that the district court did not abuse its discretion in denying the District's motion for judgment n.o.v. In addition, the district court's evidentiary rulings did not constitute an abuse of discretion warranting a new trial. Finally, the court exercised its sound discretion in awarding Morgan attorney's fees and costs related to this litigation.

We appreciate the dilemma that the District faces in trying to provide adequate penal services at a time of strained finances and in a community where the citizenry support more jails anyplace but in their neighborhoods; such serious handicaps are common to many state and local jurisdictions. The existence of such a dilemma does not redound to appellant's favor in proving up its case before this court. But the District's administrative conun-

drum cannot damp the constitutional rights of inmates of the District jails; the Constitution extends its protections even to those incarcerated in our penal institutions and offers no allowances for fiscal and political difficulties. The District cannot escape the reckoning that the jury put upon the municipality for causing the injury to Morgan. Section 1983 was created for just such purposes. The district court is affirmed in all respects.

*It is so ordered.*

STARR, Circuit Judge, dissenting:

The resolution of this case depends in no small measure on where one draws the starting line for analysis. The majority, urged on by appellee, begins from what would facially appear to be a reasonable starting point: the chronically overcrowded conditions that prevail in the prison and jail facilities of the District of Columbia. The District of Columbia, now under judgment to pay appellee $75,000 for injuries resulting from a beating administered by another inmate, starts from a rather different perspective. As counsel for the District well put it at oral argument, this case is about a fight over a peanut butter and jelly sandwich.

Both perspectives are, as not atypically happens in litigation, grounded in reality. There is no ignoring the unhappy history, ably chronicled by my colleagues, of the District of Columbia's unsuccessful efforts to deal with the swelling ranks of inmate population. This is, of course, a nationwide phenomenon. Even the most respected and thoroughly professional prison systems in the Nation have been obliged to resort to such measures as double bunking. Overcrowding, as we all know, is endemic to modern prison life.

Since overcrowded prisons are likely to be the order of the day far into the future, I think it behooves the judiciary to be exceedingly cautious in translating this unfortunate reality into a powerful instrument of constitutional tort liability. The spectre of overcrowded prisons, in the manner of Holmesian "hard cases," can distort the judgment, rendering difficult and uncertain that which should be clear. In my judgment, that is what has happened here.

## I

This is, above all, a tort suit arising out of a fight. It is critical to a dispassionate understanding of this case that one quickly dismiss from his or her mind what the case is not about. For one thing, the injuries inflicted upon Mr. Morgan were not the result of a prison riot. For another, there was no excessive use of force by prison officials. *Cf. Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). There was no deliberate indifference to Mr. Morgan's plight once the war of words erupted into something far more serious. Guards were, indeed, johnny-on-the-spot. Mr. Morgan was thus no prison analogue to a Kitty Geneovese, crying out for help with the prison personnel pulling down the window shades, as it were, or in the vernacular of the day, taking a walk.

And that brings me to what I believe is the correct analytical starting point in this case. Upon analysis, this is not, or at least should not be, a case about overcrowding. The issue is, much more narrowly, whether the record in this case provides a sufficient factual predicate for what on its face seems an extraordinary result—a $75,000 award to a co-combatant in a routine prison fight in which the plaintiff conducted himself in a manner calculated to irritate and, more, to outrage.

In analyzing and reflecting on the record in this case, I have come to the conclusion that this verdict should not stand. Even under the daunting standards governing the review of jury verdicts, *see, e.g., Tavoulareas v. Piro*, 817 F.2d 762 (D.C.Cir.1987); *Vander Zee v. Karabatsos*, 589 F.2d 723, 726 (D.C.Cir.1978), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979), this case is not even close.

## II

Dwelling on the facts of the operative events themselves leaves no small sense of wonder that a well-ordered system of jus-

tice could produce this result. As the majority faithfully recounts the facts, it appears beyond doubt that the characterization by the District of Columbia's counsel is precisely what was before the jury. Mr. Morgan and Mr. Hurt got into a fight over a jar of peanut butter, and Mr. Morgan lost.

Here is what happened. On a Sunday evening in June, almost exactly four years ago, Mr. Morgan was preparing to settle down to a peanut butter and jelly sandwich. En route to enjoy this nocturnal repast, Mr. Morgan had the misfortune of being approached by the aptly named Mr. Hurt, a rather unpleasant fellow who obviously believed in the jailhouse principle that what's yours is mine. Perhaps animated by such egalitarian notions, upon which a goodly measure of Twentieth Century social policy has been based, Mr. Hurt had the audacity to demand a sandwich.

Now at this unhappy point on that otherwise uneventful June evening, Mr. Morgan had several choices. Apparently eschewing diplomatic initiatives, "Morgan refused, and a loud argument ensued." Majority Op. at 1054. An officer arrived on the scene, seeking to inject a modicum of peace and calm into this worsening state of affairs. As the majority ably recounts, Mr. Hurt thereupon conducted himself in a most disagreeable fashion, prompting Mr. Morgan to engage in what some might view as rather odd and indeed sophomoric conduct: "When Hurt grabbed for the jar, Morgan spit into it." *Id.* This singularly unpleasant response to Mr. Hurt's ultimatum led to fisticuffs, with Mr. Morgan disproportionately on the receiving end.

So this truly was, even as the majority recounts it, a fight over a sandwich. The notion that, like cheap novels, this was really about prisonhouse sex, complete with rebuffed suitors, is fanciful, unsupported in the record save for a fellow inmate's testimony that Mr. Hurt had designs on something other than peanut butter. As spicy as that salacious innuendo might be, this is all of whole cloth. The law deals with facts. And the uncontested, undisputed truth is that these two inmates—whatever else may have been going on (or not) on the side—got into a bloody battle over Wonderbread and Skippy. The case is as simple as that.

### III

It may be thought at this juncture that I have conveniently overlooked the psychiatric record of Mr. Hurt and the evidence that he should have been situated in a different section of the facility. But *apropos* to what the case is really about, the charge will not stick. The reason is that the precise issue before us is not whether the D.C. jails are overcrowded (they are), or whether Mr. Hurt is a dangerous man (he is), but whether the District *obdurately and wantonly* failed adequately to protect Mr. Morgan. *See Whitley,* 106 S.Ct. at 1084; *Estelle v. Gamble,* 429 U.S. 97, 104–06, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976).

True, overcrowded conditions and the degree of risk posed by each individual prisoner bear on the amount of security necessary to ensure a reasonably safe prison environment. But the record in this case is totally devoid of evidence that the *security* at the District of Columbia Jail fell short of the *constitutional* minimum.

The Supreme Court's teaching is clear: "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety. This reading of the Clause underlies our decision in *Estelle v. Gamble....*" *Whitley,* 106 S.Ct. at 1084. Rather than mere negligence, "[i]t is *obduracy and wantonness,* not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cell block." *Id.* (emphasis added).

Now the question whether prison officials acted reasonably to secure an inmate's safety is scarcely one within the layperson's realm. The reasonably pru-

dent juror cannot be expected to appreciate the multifarious considerations involved in either prison security arrangements or the closely related questions of safekeeping and assignment of prisoners. Indeed, the Court has repeatedly stressed that " 'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators,' *Rhodes v. Chapman,* 452 U.S., at 349, n. 14 [101 S.Ct. at 2400, n. 14]." *Whitley,* 106 S.Ct. at 1085. For that reason, " '[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' *Bell v. Wolfish,* 441 U.S., at 547 [99 S.Ct. at 1878]." *Id.* (ellipsis in original).

Because matters of prison security are so sensitive, and involve so many competing considerations unappreciated by the lay juror, the law generally requires expert testimony to establish a lack of proper security precautions. *See Murphy v. United States,* 653 F.2d 637, 646 & n. 32 (D.C.Cir. 1981). This is a sound and sensible principle, which merits application in the case at hand. But, in this case, there was no expert testimony (and, indeed, no evidence whatever) as to prison security (such as the placement of prisoners, the proper number and placement of guards in relation to the arrangement of prisoners, and correctional procedures regarding inmate fights). Likewise, there was no expert testimony that Mr. Hurt was misassigned. Indeed, the majority concedes that Dr. Papish, the head of the prison's psychiatric clinic, refused to say that, in light of Mr. Hurt's history of violence and instability, he would have recommended Mr. Hurt's placement in the lock-down facility. Majority Op. at 1060.

The disturbing result of this absence of expert guidance is that the jury was left in its deliberations to speculate on the role of overcrowding in the jail as a whole, and whether the security arrangements in Southeast-Three were sufficient to deal with someone of Mr. Hurt's propensities. In other words, the jury was permitted to determine that security in Southeast-Three was inadequate (and, indeed, inadequate due to obduracy and wantonness), without evidence as to what constitutes adequate security at a prison. And it should go without saying that a correct instruction as to the law will not do service for a gaping evidentiary hole.

As we made clear in *Murphy,* "a prisoner has no right to demand the level of protection necessary to render an institution assault-free (he is only entitled to 'reasonable protection' from assaults ...)." 653 F.2d at 644. And, to establish a *constitutional* violation, the prisoner must show "obduracy and wantonness, not inadvertence or error in good faith." *Whitley,* 106 S.Ct. at 1084. The facts in this case manifestly do not rise to this daunting standard.

For when the altercation began (indeed even before it had escalated into a fistfight) a prison guard was on the spot trying to subdue the argument. As the dispute moved beyond a war of words, a second guard arrived on the scene. The two guards, far from standing idly by with deliberate indifference to Mr. Morgan's plight, intervened (with one apparently receiving blows as well). This is scarcely the stuff of obduracy and wantonness, which is what *Whitley* interprets the Constitution (and *Estelle*) as demanding. There is not one whit of evidence that Mr. Hurt was assigned to Mr. Morgan's precinct as part of some sadistic or malevolent plot to unleash a mad-dog prisoner on the law-abiding, pacific general populace.

### IV

As should by now be apparent, this case represents a wild extension of causation principles in the law of constitutional tort. General overcrowding coupled with a violent, and perhaps misassigned, prisoner will now, taken together, do service to work a constitutional violation, regardless of how intemperate and ill-advised the conduct of the "victim." It is all the more troubling since prison authorities are well advised not to keep individuals, even those like the redoubtable Mr. Hurt, in conditions that are unduly confining. For prison officials are also threatened with liability for shack-

ling potential aggressors to extraordinary restraints, such as conditions of administrative segregation and the like.

We do well in the law to remember the simple truths. And one such truth, uttered at the Founding, is that if men were angels, government would not be necessary. The complicated souls who are unable, for whatever reason, to live peacefully in society in obedience to law present among the most difficult challenges to governments that are obliged to deal with them consistent with constitutional constraints. Today's result blinks at that truth, representing a triumph of skilled lawyering over basic common sense.

This verdict is profoundly wrong.