James Douglas COX, Plaintiff,

v.

The DISTRICT OF COLUMBIA,
et al., Defendants.

Civ. A. No. 91–2004 (JHG).

United States District Court,
District of Columbia.

April 26, 1993.

As Amended May 21, 1993.

Judgment Order May 21, 1993.

2

George A. Lehner, Pepper, Hamilton & Scheetz, Washington, DC, for plaintiff.

Edward Schweitzer, Jr., Asst. Corp. Counsel, DC, Washington, DC, for defendants.

**MEMORANDUM OPINION AND ORDER**

JOYCE HENS GREEN, District Judge.

On August 9, 1991, plaintiff James Douglas Cox ("Cox") initiated this action against the District of Columbia ("the District"), Officer Barry Goodwin ("Goodwin"), Officer William Brady ("Brady"), and unknown police officers and supervisors, alleging, *inter alia,* that he was assaulted by the above-mentioned police officers, all of whom were employed by the Metropolitan Police Department ("MPD"). Although the summons and complaint were served on both Goodwin and Brady on September 13, 1991, neither officer responded to the complaint within the time provided by the Federal Rules of Civil Procedure. As a consequence, on October 23, 1991, the Clerk's Office entered default against each officer. Upon hearing Cox's motion for entry of judgment by default on February 18, 1992, the Court entered default judgments against Brady in the amount of $10,000 compensatory damages and $100,000 exemplary damages, and against Goodwin in the amount of $100,000 compensatory damages and $250,000 exemplary damages. Accordingly, only Cox's claim against the District remains outstanding.

In September 1992, Cox and the District advised the Court that in light of their agreement to submit a joint stipulation of facts, individual statements of evidence, and individual proposed findings of fact and conclusions of law, trial would not be necessary. Thereafter, the Court approved the parties' agreement and established a briefing schedule. Presently pending are a Joint Stipulation of Facts, individual statements of evidence, the Proposed Findings of Fact and Conclusions of Law, and each parties' reply thereto. Upon consideration of all of the pleadings and for the reasons stated below, judgment is entered in favor of plaintiff, James Douglas Cox and against defendant, the District of Columbia.

## I. FACTUAL FINDINGS

### A. The December 30, 1990 Incident

By affidavit and in sworn testimony presented to the Court during the February 28, 1992 default hearing, Cox alleges the follow-

ing: On December 30, 1990, at approximately 3:00 a.m., he was driving on M Street between 21st and 22nd Streets, N.W. While in the far left lane, Cox began to execute a lane change; he did so, however, without using his turn signal. Because Cox observed a car in his blind spot, he did not change lanes, but remained in the far left lane. Immediately after this aborted attempt to change lanes, a paddywagon that had been following Cox turned on its emergency lights, signalling Cox to pull his car over to the side of the street. Cox responded by promptly stopping his vehicle in a parking lot on the corner of M Street and New Hampshire Avenue.

Once stopped, Cox unbuckled his seatbelt, rolled down his window, and began to look for his automobile registration. When Goodwin approached the vehicle, Cox handed him his driver's license and car registration. After receiving the license and registration, Goodwin questioned Cox, asking, *inter alia*, whether he had been drinking. Cox answered in the negative, adding that he had not had anything to drink "in hours." Then, Goodwin reached into plaintiff's car through the window, turned off the ignition, removed Cox's car keys from the ignition, and threw them over his shoulder onto the pavement. Goodwin proceeded to verbally abuse Cox, ordering Cox not to leave the car and at the same time inviting him to exit his car so that the officer could fight him. This verbal abuse culminated in a threat to shoot Cox. Meanwhile, Goodwin had kicked Cox's car keys from the pavement onto the grass.

By this time, two other back-up patrol cars had arrived on the scene. Goodwin returned to the paddywagon to write Cox a ticket, which he later threw onto the passenger seat of Cox's car while taunting Cox. At some point during the interchange, Goodwin threw Cox's driver's license into the grass. In order to retrieve his driver's license, Cox exited his car and while he was out of his car, he asked Goodwin for his badge number. As he pointed his finger towards Goodwin's badge, at the same time attempting to look at the officer's nameplate (which he could not see clearly because it was partly obscured), Goodwin struck Cox in the head with his night stick and declared that Cox was under arrest. Next, Goodwin slammed Cox against the paddywagon and other officers present hit and beat Cox, knocking him to the ground. The officers then handcuffed Cox and, once cuffed, rolled him onto his back. One officer (unknown, but not Officer Brady) told Cox not to look at the officers and then stepped on him, grinding his boot into Cox's face. Eventually, the officers brought Cox to a standing position and instructed him to get into the back of the paddywagon. Cox complied. For the next twenty to thirty minutes, the officers drove around with Cox, handcuffed, but not seatbelted. Thus, each time the officer driving the paddywagon maneuvered abruptly or suddenly applied the brakes, Cox was tossed against the interior wall of the paddywagon. The paddywagon finally arrived at the police station at 4:10 a.m.

Once at the station, Goodwin grabbed Cox by the upper left arm, which caused four round bruises from the officer's fingers. Upon entering the station, another officer told Goodwin and his partner to bring Cox over to her. At this point, Cox's injuries consisted of lumps on his head, two splits above his eye, a black and blue eye, a swollen chin, and a large bruise under his buttocks. In addition, he complained of paralysis from the left elbow down to the left thumb and a sharp pain in his neck. Upon examining Cox, the officer expressed her opinion that Cox should be taken to the hospital.

At the station, Goodwin processed plaintiff on a charge of disorderly conduct. When Cox asked if he could make a telephone call, Goodwin failed to respond. Cox persisted by asking other officers if he could make a call, and they in turn responded that it was up to the arresting officer. When Cox later was asked to sign some forms, he indicated on the forms that he had not been permitted to make a telephone call or to seek counsel. Officer Goodwin tore up those forms. In order to expedite his release, Cox ultimately signed identical forms without commenting upon his inability to make a telephone call or consult with an attorney.

Also while at the police station, a supervisor, Sergeant Cook, interviewed Cox and asked him how he had received his injuries.

Cox informed Sergeant Cook that he had been assaulted by Goodwin, and described the events outlined in this opinion, however, while Cox was present, Sergeant Cook took no further action concerning the use of force allegations.

Later, during the booking process at the police station, Goodwin advised Cox to refuse treatment at the hospital, ostensibly so that Cox could be released sooner. When Cox asked Brady why he was being treated in the manner that he was, Brady responded "slow night." Although another officer finally did take Cox to the hospital, he was told by a nurse that he had arrived too late for the wounds above his eye to be properly stitched. While at the hospital, Cox again asked the officers on several different occasions whether he could make a telephone call. Eventually, at 6:20 a.m., one officer made a call on Cox's behalf. Several hours later, Cox was driven back to the police station where he was released after posting the required $25 bond.

The citation Cox received for disorderly conduct required him to appear in court at a later date. In accordance with the citation, he duly presented himself in court on the appointed date, however, no police officer appeared. As a result, the charge against him was dropped. The traffic citation he received for his turn signal violation was also dropped.

Cox received three permanent scars from the incident; one from the handcuffs on his right wrist and two above his left eye. In addition, he still suffers recurring pain in his neck area.

## B. History of the Civilian Complaint Review Board

As one would expect, District of Columbia law prohibits the use of unnecessary or wanton force by a police officer and supporting regulations similarly require that police officers act constitutionally. D.C.Code § 4–176 (1988); Joint Stipulation of Facts ("Stipulation"), ¶ 1. Police recruits are told that they may use reasonable force, the reasonableness of which depends on the circumstances with which the recruit is faced. Similarly, recruits are instructed that excessive force may result in removal from the police force, criminal charges, and/or civil damages. Id., ¶ 2. If, at any time while an officer is on probation during his or her first year of employment, the officer's conduct is deemed unsatisfactory, the officer must be terminated. D.C.Code § 4–106.

Prior to 1982, citizen complaints regarding police misconduct were handled directly by the MPD.[1] Stipulation, ¶ 3. In 1980, however, the District of Columbia Council ("the Council") promulgated the Civilian Complaint Review Board Act of 1980 ("the Act"). D.C.Code §§ 4–901 to 4–911 (1988 & Supp. 1992). The Act created the Civilian Complaint Review Board ("the CCRB"), consisting of seven part-time members, charged with making findings and recommendations with respect to citizen complaints concerning misconduct by officers of the Metropolitan Police Department. Id. § 4–902.[2] The CCRB was created to provide "a formal mechanism for public participation and public review of allegations of misconduct which undermine community respect for and cooperation with the police." Stipulation, ¶ 4.

The Act granted the CCRB exclusive jurisdiction over citizen complaints of police harassment, use of excessive force, and use of demeaning language, except for complaints in which there is "any probability that the alleged misconduct was criminal in nature." Id. § 4–903(d).[3] If the CCRB con-

1. The Judiciary Committee of the District of Columbia published a report of statistical findings from a study of citizen complaints filed between September 1974 and June 1979. During that period, 1,888 complaints were filed, at a rate of approximately one per day. Id., ¶ 3. 92% of the complaints were deemed unfounded by the MPD and the remaining 8% were labeled "well founded." Id.

2. The original size and composition of the CCRB resulted from a recommendation by the U.S. Department of Justice Community Relations Service that a five- to seven-member board, reflective of the community, was essential in the civilian complaint process. Stipulation, ¶ 6.

3. As part of its authority, the CCRB is responsible for promulgating rules and procedures "which ensure at a minimum: ... The adjudication of complaints and forwarding of findings of

cludes that there is any probability of criminal misconduct, the complaint must be referred to the United States Attorney's Office ("the USAO") for investigation. Once referral has occurred, the CCRB loses jurisdiction over the investigation and only regains jurisdiction if the USAO decides not to prosecute the officer. CCRB Rule 300.8. Similarly, while a citizen complaint is pending before the CCRB, the MPD is divested of authority to investigate or otherwise discipline any officer on the basis of the complaint except in the following discrete group of cases: any citizen complaint submitted to the MPD regarding the use of service weapons, including police batons, is reviewed by the MPD's Weapon's Review Board;[4] citizen complaints involving criminal conduct by police officers which appear well founded are referred to the USAO for potential prosecution; and, the MPD may conduct investigations expressly recommended by the CCRB or by the USAO. Stipulation, ¶ 4.

Once a complaint is submitted to the CCRB, the CCRB is required by statute to schedule a hearing date within thirty days. D.C.Code § 4–905(a). The statute also requires that the accused officer be given "sufficient opportunity to respond to the allegations in any complaint" and the results of any investigation are to be "written in an investigative report, filed with the Board, and served on every party." *Id.* Moreover, "[a]bsent unusual circumstance, … investigation shall be completed within 90 days." CCRB Rule 100.2; Stipulation, ¶ 7. After the investigation has been completed and the

statutorily required hearing has been held, the CCRB must make findings on the merits.[5] No complaint may be disposed of except on the vote of the CCRB. If, after voting, the CCRB sustains a complaint, it also recommends a sanction which may either be accepted or rejected by the Chief of Police within thirty days. D.C.Code § 4–903(c). Then, even if the Chief of Police accepts the CCRB's decision, the Mayor retains the authority to overrule that decision. Stipulation, ¶ 7. Furthermore, any remedy recommended by the CCRB is "cumulative of any others provided by statute or at common law." D.C.Code § 4–909(e).

The number of complaints filed from 1982 when the CCRB was first established until 1991, when this case was initiated, generally increased from year to year. Only in 1985, did the number of complaints filed fall from the number filed the previous year:

| Year | Number of complaints filed |
|------|----------------------------|
| 1982 | 137 |
| 1983 | 299 |
| 1984 | 369 |
| 1985 | 299 |
| 1986 | 348 |
| 1987 | 353 |
| 1988 | 358 |
| 1989 | 381 |
| 1990 | 415 |
| 1991 | 499 |

Plaintiff's Statement of Evidence ("Plaintiff's Evidence"), Exhibit 1.

Likewise, the average length of time between the date a complaint was filed with the CCRB and the date a recommendation was handed down has generally increased each year:

---

fact to the Chief of the Metropolitan Police Department in an *expeditious manner.*" *Id.* § 4–903(b)(2) (emphasis added).

4. The MPD also has a "self-policing" rule which requires any officer who uses a service weapon (which includes a night stick) or any officer who has knowledge of the use of a service weapon to submit a written explanation to that officer's commanding officer. The Weapons Review Board is required to review all such incidents. Stipulation, ¶ 5. However, the fact that the

Weapons Review Board may investigate this type of complaint if brought to its attention does not divest the CCRB of its obligation to investigate a complaint of excessive force filed with the CCRB.

5. Larry Dean Soulsby, a Police Inspector at the MPD, while as Director of the Disciplinary Review Division in the Administrative Services Bureau, stated that: "For [discipline] to be truly effective, it has to be timely." Plaintiff's Statement of Evidence, Exhibit 14.

| Fiscal Year | Average time in months |
|---|---|
| 1983 | 8.00 |
| 1984 | 16.75 |
| 1985 | 20.75 |
| 1986 | 23.40 |
| 1987 | 21.40 |
| 1988 | 18.50[6] |
| 1989 | 28.60 |
| 1990 | 33.10 |

Stipulation, ¶ 9. At the end of its first five years of existence, the CCRB had received a total of 1,742 complaints and had a backlog of approximately 1,000 cases. Of the 1,742 cases filed, the CCRB had made findings on the merits in only 145 cases, sustaining at least one allegation[7] of misconduct in 65 of those 145 cases.[8] *Id.* ¶ 9.

The following chart summarizes the number of cases filed, the number of complaints that were identified as excessive force complaints, the number of cases dismissed by the CCRB, the number of cases that received hearings, and the number referred to the USAO for possible criminal prosecution:

| | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|
| *Cases filed with CCRB | 358 | 381 | 415 | 499 |
| Excessive force cases | —— | 211 | 222 | 270 |
| Cases dismissed | 165 | 428 | 508 | 210 |
| Cases heard | 41 | 49 | 64 | 64 |
| Cases referred to USAO | —— | 19 | 12 | 55 |

* indicates that the data is for the fiscal year. Stipulations, ¶¶ 11, 15, 21, 26.

---

The CCRB's chronic backlog has generated several newspaper articles. For example, in 1987, the *Washington Post* reported that:

> The board responsible for handling complaints by citizens against D.C. police officers acknowledged that its system is a failure, and issued a list of 1,450 mostly unresolved cases to illustrate the problem.
>
> The 23–page list of complaints, sent last night to D.C. Police Chief Maurice T. Turner Jr., represents the first step in what board members and officials said will be a series of steps aimed at overhauling the Civilian Complaint Review Board....

Plaintiff's Evidence, Exhibit 21. Then, on August 12, 1991, the *Washington Post* reported that "[p]erenially facing a backlog, the District's Civilian Complaint Review Board now has new complaints coming in four times faster than existing ones are being resolved, and the board's chairman sees no way for the panel to dig its way out." *Id.*, Exhibit 17. Commenting on CCRB's ability to eradicate its backlog, the CCRB chairman stated: "It's a physical impossibility." *Id.* In much the same vein, the CCRB's Executive Director stated, "[s]omething's got to give." *Id.*

At its inception in 1982, the CCRB's initial budget was $150,000 and, in addition to the seven-member board, the CCRB had a five-person staff. Defendant's Evidence, Exhibit J; Plaintiff's Evidence, Exhibit 18; Stipula-

---

6. But, the average climbed to 20.9 months for those cases in which an allegation of misconduct was sustained. Stipulation, ¶ 11.

7. Each CCRB complaint can be comprised of one or more separate allegation of misconduct.

8. During the 1986 through 1990 time period, the CCRB received a total of 1,854 complaints, of which only 490 were processed. Plaintiff's Evidence, Exhibit 23.

tion, ¶ 9. In 1986, the staff had increased to nine and the budget was $378,000. Defendant's Evidence, Exhibit J. At the end of fiscal year 1986, one more staff member was added. *Id.*

In late 1987, with the arrival of a new executive director, the CCRB instituted a policy of dismissing cases in which the complainant had lost interest, moved away, or died. Stipulation, ¶ 10. As a result of this policy, the CCRB was able to remove 279 cases from its docket in 1987. In addition, the CCRB proposed to the District of Columbia several administrative reforms to streamline its procedures and increase its capacity to resolve cases. Specifically, the CCRB proposed in 1987 and 1988 that the number of Board members be increased, that the Board be permitted to hear cases in panels, that conciliation procedures be authorized for less serious cases, and that the CCRB receive more investigators. *Id.,* Exhibits 2, 3. No action was taken on either the 1987 or the 1988 proposal. *Id.*

In 1988, the CCRB's budget was increased to $433,000, Plaintiff's Evidence, Exhibit 4, and in 1990, the budget was increased to $805,000 and the staff was nearly doubled. *Id.,* Exhibit 8. The next year, the CCRB submitted a budget request of almost twice its 1988 funding, requesting an additional ten full-time employees. The increase was justified to "enable the Board to resolve the growing backlog of cases filed." *Id.,* Exhibit 4. Also in 1989, a proposed bill to amend the Act was sent to the City Council. *Id.,* Exhibit 5. Had the proposed amendment been promulgated, it would have essentially codified the changes requested in 1987 and 1988. However, no action was taken on the proposed bill. *Id.*

In 1990, the CCRB requested another budget increase, which included a funding request for twenty-four full-time positions. *Id.,* Exhibit 6. The Council responded by increasing the CCRB's budget and authorizing more positions, however, the CCRB received five fewer positions and $285,000 less than it had requested. *Id.,* Exhibit 7. In addition, the Council implemented "a voluntary conciliation program aimed at disposing of less

serious cases in a more expeditious manner." *Id.*

In its 1991 and 1992 budget requests, the CCRB warned the District of Columbia that the CCRB's ability to eliminate the backlog of pending complaints was linked to the potential grant of legislative relief authorizing the Board to establish panels to hear cases. *Id.,* Exhibits 8, 3. Specifically, in its 1991 request, the CCRB noted:

> Since opening its doors in 1982, over 2,500 complaints have been filed with the board—an unprecedented 381 complaints, representing over 720 allegations, were filed in the last fiscal year alone. Within only the first two years of the board's operation, the number of complaints filed quickly overwhelmed the board's ability to keep pace and a backlog had developed. During the past fiscal year, the board took several steps to further address the backlog including: maximizing the hearing schedule and improving intake procedures and case taking procedures. However, the board encountered several significant setbacks in its effort to reduce the backlog during FY 1989 which make elimination of the backlog, originally targeted for FY 1991, impossible to achieve. Among these were the reduction in appropriated staff and difficulties in filling vacant positions. Perhaps the single most deleterious setback was the absence of legislative remedies proposed in the Civilian Complaint Review Board Reestablishment Amendment Act. The board continues to believe that the most effective solution to the rapid elimination of its backlog would be the grant of legislative relief authorizing both the expansion of the board ... and the authority to establish panels to handle cases.

*Id.,* Exhibit 8. Similarly, the 1992 budget request emphasized the need for legislative action in order to eliminate the backlog of complaints. *Id.,* Exhibit 3.

In January 1992, Councilmember Wilhelmina Rolark circulated a report regarding a June 19, 1991 hearing on police misconduct in the District. The report stated that:

> Backlog cases are those where complaints have not been heard within 120 days of

their filings, as required by D.C.Code § 4–901. Of the Board's current caseload of 902, as of September 30, 1991, 789 are backlogged cases.

*Id.*, at Exhibit 1. The report added that approximately 74% of the CCRB's pending caseload contained allegations of excessive force. It further noted that "the many critical injuries and fatalities suffered at the hands of D.C. police officers are testament to the severity of the problem. . . . The discouraging fact for many District residents is that it takes an average of two years before a case is heard and sometimes as many as four years." *Id.*

One month later, Councilmember Rolark introduced the D.C. Civilian Complaint Review Board Amendment Act of 1992. *Id.*, Exhibit 9. The proposed bill authorized expansion of the Board from seven to twenty-one members, permitted the Board to compel prehearing statements from police officers, provided for summary disposition of cases based solely upon the investigative record, and permitted the Board to apply for and receive grants to fund its programs. *Id.*, Exhibit 10. The legislative report to the Act states that:

> As structured, the CCRB simply cannot handle its pending caseload in a timely and efficient manner. The result has been an overwhelming backlog. Some cases have lingered for two, three, and sometimes four years without any action, thereby creating disillusionment and a lack of citizen confidence in the process. Moreover, under current law, the CCRB only has two adjudicative remedies: dismissal or a full evidentiary hearing. The sheer volume of cases, coupled with 72% of the caseload containing allegations of excessive force, presents an impossible task for a seven member board since the majority of the caseload would require a full evidentiary hearing. Changes in the organizational structure and authority of the Board are needed if the Board is to be responsive and accountable to the District residents. Bill 9–433 proposes some of the changes necessary to meet that objective.

*Id.*, Exhibit 9.

On January 10, 1992, the MPD instituted an program called Early Warning Tracking System ("EWTS") to identify officers against whom three or more citizen complaints or civil law suits arising from police activities had been filed within a twenty-four month period. Stipulation, ¶ 28. Pursuant to the EWTS, any officer so identified is evaluated by the MPD's Medical Services Division and the officer's commanding officers to determine whether the officer is experiencing behavioral problems. *Id.*

In July 1992, the Council adopted amendments to the Act which would allow the CCRB to use a mediator to resolve some cases, allow the CCRB to hear cases in panels, permit the CCRB to make summary adjudications, and compel officers to give sworn statements prior to a full hearing. Stipulation, ¶ 30. In addition, the amendments increased the size of the CCRB to twenty-one persons. *Id.*

## C. Goodwin's MPD History

On October 24, 1988, Goodwin began duty as a police officer with the MPD. Stipulation, ¶ 12. Initially, Goodwin was a cadet at the Metropolitan Police Training Academy, and was thus placed on probationary status for his first year of employment. *Id.* As earlier stated, if at any time during that probationary period, his conduct had been determined unsatisfactory by the Mayor or her agent, he would have been terminated. *See* D.C.Code § 4–106. Moreover, this termination requirement had been regularly enforced by the MPD during 1988 and 1989 based on information possessed by the MPD. Stipulation, ¶ 12.

On August 10, 1989, during Goodwin's probationary term, Kenneth E. Heitner ("Heitner") filed a complaint with the CCRB against Goodwin and two other police officers alleging assault, false arrest and use of excessive force. Stipulation, ¶ 13; Plaintiff's Evidence, Exhibit 24. In pertinent part, that complaint stated that during an incident which began as a collision between one of his friends and a motorcycle officer, Heitner was thrown through a store window by an unknown officer and then "continually harassed" by Goodwin. *Id.* In addition to alleging harassment, when Heitner took out a pen in order to record what was occurring to him and his friends,

[b]oth Officers Goodman and Lanuze, who were about 10 feet away rushed over and grabbed the pen from my hand. I identified the pen and tried to explain that I just wanted to write down some notes. At this point I was told to shut up and told that I was now under arrest. Since when is it illegal to write oneself a note? I was then handcuffed so tightly that my wrists bled. Never over the course of the evening had I spoken or acted in a threatening manner, yet the officers used excessive force on me. Handcuffed, I was thrown by the police officers against the hood of the car and then into the back seat.

*Id.* Moreover, Heitner signed an affidavit averring that his "complaint fully and accurately sets forth the events which transpired early in the morning of August 10, 1989." *Id.* He added that "[t]o date, the CCRB has taken no action on the complaint."[9] *Id.* That affidavit was signed on September 10, 1992.

Several days after the complaint was filed in August 1989, Goodwin's supervisors evaluated his employment as a probationary officer and, stating that they knew of no unbecoming conduct on his part, they recommended that he continue on the force. Stipulation, ¶ 16. Over a month later, after a formal review of "documentary and medical records," a Probationary Review Board recommended on September 28, 1989, that Goodwin be retained. *Id.*, ¶ 17. Goodwin's period of probation ended on October 24, 1989—more than two months after the Heitner complaint had been lodged with the CCRB. *Id.*, ¶ 18.

In January 1990, the CCRB sent the Chief of Police a compilation of CCRB complaint data, which included a list of "Multiple Complaint Officers," defined as those officers against whom three or more complaints were pending at the end of fiscal year 1989. *Id.*, ¶ 19. Goodwin was not on that list. The same information was delivered to the Chief of Police in March 1991, listing multiple complaint officers for fiscal year 1990. *Id.*, ¶ 23. Goodwin was also not on that list.

In early March 1992, Goodwin became the first MPD officer to be removed from public contact under the recently established EWTS.[10] Stipulation, ¶ 29.

## II. DISCUSSION

▊▊▊ This case arises under section 1983 of the Civil Rights Act of 1871 which states:

---

**9.** The District explains that Heitner moved from the Washington, D.C. area without giving the CCRB an address, implicitly asserting that Heitner caused the lack of action taken by the CCRB. *See* Defendant's Evidence, Exhibit H. However, as the Chief of Investigations at the CCRB admits, a letter was not sent to the address listed on Heitner's complaint until *August 10, 1992*—three years after the events complained of occurred. Then, after its August 10, 1992 letter was returned because the address was not known, the CCRB learned that Heitner had moved to the New York area.

**10.** The EWTS affected Goodwin because three complaints had been filed against him since the incident involving Cox. For example, on January 29, 1991, another complaint alleging excessive force against Goodwin was filed with the CCRB. In this complaint, Kevin Taylor ("Taylor") stated that on December 8, 1990, Goodwin

grabbed me and pushed me up against the side of the police cruiser, put both my hands on the hood and said something to the effect of, "When I tell you to walk, you walk!" I replied by saying, "We were walking." He then grabbed my right arm and pulled it behind me as far as it would physically go. I put up a little scuffle while asking him and his partner

what did I do? ... He then handcuffed me and walked me towards the newly arrived police cars. A white male police officer ... hit me in the stomach with a flashlight.... I was then thrown up against the seat of the cruiser and my head was knocked into the trunk of the car. Officer Goodwin said at this point, "You don't [expletive] with me." I was then grabbed by the collar and pant waist and hurlled [sic] into the police car.

Plaintiff's Evidence, Exhibit 26. On April 11, 1991, Lawrence E. Robinson filed a CCRB complaint against Goodwin, however, he claimed only that Goodwin harassed him and used demeaning language—there was no allegation of excessive force. *Id.*, Exhibit 12. Likewise, on July 1, 1991, Alireza M. Mostafavi filed a CCRB complaint against Goodwin also claiming that Goodwin had harassed him without cause or reason. *Id.*, Exhibit 13.

However, because these incidents occurred after the Cox incident, they were not considered when determining that the District is liable; they are unnecessary to the determination that the District has a custom of deliberate indifference that caused constitutional injury to Cox. They are referenced only to explain why Cox was placed on the EWTS and to provide context for an argument advanced by the District *infra*.

Every person, who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (1988). Since 1978, the proposition that a municipality, as well as an individual, can be found liable under section 1983 has been well-settled. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694–95, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). Either an official policy or "practices of state officials ... so permanent and well settled as to constitute 'custom or usage' with the force of law," *id.* at 690–91, 98 S.Ct. at 2035–36 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970)), may support municipal liability. However, a municipality may be held liable only when the execution of its official custom or policy is actually responsible for the deprivation of constitutional rights.[11] *See id.; see also Morgan v. District of Columbia*, 824 F.2d 1049, 1058 (D.C.Cir.1987). Thus, a *respondeat superior* relationship is not sufficient to invoke municipal liability, the city itself must be to blame for the custom or policy and that custom or policy must have caused the deprivation at issue. *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477–78, 106 S.Ct. 1292, 1297, 89 L.Ed.2d 452 (1986). As applied to this case, "liability may be imposed on a municipality upon a showing of deliberate indifference exhibited by a pattern of inadequate training, supervision and discipline of police officers provided that there is a causal connection between such inadequacies and the risk of harm to others." *Parker v. District*

*of Columbia*, 850 F.2d 708, 712 (D.C.Cir. 1988), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1339, 103 L.Ed.2d 809 (1989). Accordingly, notwithstanding the now uncontroversial existence of municipal liability, the strict requirement that more than vicarious liability be demonstrated has engendered significant debate and the parameters of that liability—policy or custom, deliberate indifference, and causation—are once again the subject of controversy in the instant case.

## A. Policy or Custom

▉ Like its companion element of causation, the first element of municipal liability—the existence of a policy or custom—is not nearly as simple to define as it is to recite. The first task is, of course, to identify and define the particular policy or custom at issue; only then can the more difficult question of whether such a policy or custom existed be addressed. In this case, Cox claims that the District of Columbia had a policy or custom of dilatory investigation of citizen complaints of excessive force filed against its officers. According to Cox, the chronic delays in the investigation and resolution of citizen complaints resulted in delayed discipline which, in practice, is the functional equivalent of no discipline.

▉ Despite the apparent peculiarity of the allegation that a city might have a policy of inadequately training or of not effectively disciplining its police officers, that proposition is now well-accepted and may indeed form the basis for municipal liability. As the Supreme Court observed,

it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*ham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Instead, Cox was beaten for no apparent reason. This finding is fully supported by the default judgments entered by this Court against Goodwin and Brady.

---

11. The Court finds, based on the entire record herein, that Cox's constitutional rights were violated by both Goodwin and Brady. Cox's sworn statements, both at the default hearing and in his affidavit, clearly demonstrate that excessive force was used against an individual who did not present any objective danger to Goodwin. *See Gra-*

*City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). Analogously, a city's complete failure to maintain an adequate system of disciplining officers who act unconstitutionally might also "fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id.; see, e.g., Bielevicz v. Dubinon*, 915 F.2d 845, 852–53 (3d Cir.1990) (acquiescence to custom of arresting individuals without probable cause sufficient to support municipal liability); *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1247–48 (6th Cir.1989) (failure to investigate and supervise jailkeeper's deplorable treatment of paraplegic inmates sufficient to support municipal liability), *cert. denied*, 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990); *Harris v. City of Pagedale*, 821 F.2d 499, 504–06 (8th Cir.) (failure to take remedial action against known pattern of sexual misconduct by police officers sufficient to support municipal liability), *cert. denied*, 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 326 (2d Cir.1986) (failure to investigate claims of police brutality sufficient to support municipal liability), *cert. denied*, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); *cf. Morgan v. District of Columbia*, 824 F.2d 1049, 1058 (D.C.Cir.1987) (affirmance of jury verdict that the District had an official policy, custom or practice of failing to take significant steps to prevent a known risk in a jail).

In addition to concluding that a policy of failing to take action could amount to a policy or custom, *City of Canton v. Harris* held for the first time that constitutional policies as well as unconstitutional policies could result in municipal liability under section 1983. 489 U.S. at 387, 109 S.Ct. at 1203. In *Harris*, the Supreme Court considered an individual's allegations that a city's failure to train its officers caused an unconstitutional result,

and concluded that, in "limited circumstances" when the inadequacy of training "amounts to deliberate indifference to the rights of persons with whom the police come into contact," liability could attach to a municipality. *Id.* The Court chose the demanding standard of deliberate indifference in order to conform to earlier caselaw which had held that liability could be imposed only where the municipality's policies are the "moving force" behind the constitutional violation; thus, only in circumstances where a deliberate choice to follow a course of action was made from among various alternatives. *Id.* at 389, 109 S.Ct. at 1205. As the Supreme Court explained, a lesser standard of fault or causation would not only "open municipalities to unprecedented liability under § 1983," but it "would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs." *Id.* Such an exercise is ill-suited to the federal courts and would additionally implicate significant federalism issues. *Id.*

■ Accordingly, the next step is to determine whether the consistent and chronic delays endemic to the District of Columbia's civilian complaint review process constituted a policy or custom and whether maintenance of that policy or custom amounted to deliberate indifference by the District to its residents or to any other individuals who might come in contact with District police officers.[12] Even before *City of Canton v. Harris* held that a municipality could be held liable for a policy of failing to train, this Circuit addressed that issue and stated that municipalities could be held liable under section 1983 when a plaintiff demonstrates "deliberate indifference manifest by systematic and grossly inadequate training, discipline and supervision." *Parker v. District of Columbia*, 850 F.2d 708, 712 (D.C.Cir.1988). Because this holding was later ratified by the Supreme

---

12. As a preliminary matter, the Court notes that this case should be analyzed under the rubric of custom or pattern, not policy. Clearly, the "custom or policy" alleged in the instant case is best described as "a given course of conduct although not specifically endorsed or authorized by law, [it] is so well-settled and permanent as to virtually constitute law." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir.1990); *see also Fletcher v.*

*O'Donnell*, 867 F.2d 791, 793–94 (3d Cir.), *cert. denied*, 492 U.S. 919, 109 S.Ct. 3244, 106 L.Ed.2d 591 (1989) ("Custom may be established by proof of knowledge and acquiescence."). Plaintiff claims precisely this—that the District had knowledge of and acquiesced to the large backlog of unresolved complaints lodged in the CCRB, thus constituting a custom.

Court in *Harris*, those cases decided by this Circuit prior to *Harris* continue to provide valuable analytical guidance today. This Circuit has held that, since police misconduct cases rarely involve express statements of policy, a plaintiff must first show a course of conduct deliberately pursued by the municipality in order to prevail. *Id.* To establish a pattern, policy or custom, a plaintiff must present "concentrated, fully packed, precisely delineated scenarios" of unconstitutional conduct. *Id.* (quoting *Carter v. District of Columbia*, 795 F.2d 116, 125 (D.C.Cir.1986)).

Again, despite the Supreme Court's words and this circuit's teaching, that measure (and type) of proof sufficient to establish municipal liability is not easy to quantify; application of *Harris* and its progeny has spawned two entirely conflicting interpretations. For instance, in the present case, Cox argues that the District had adopted "through acquiescence, omission and persistent neglect a policy or custom of failing to address in a timely and effective fashion instances of police brutality." Plaintiff's Memorandum of Law in Support of Plaintiff's Findings of Fact and Conclusions of Law (Plaintiff's Memo), at 8. To support his assertion, Cox points to the following facts: the CCRB had exclusive jurisdiction to investigate complaints of excessive force; the MPD was not authorized to discipline its officers for excessive force unless the CCRB had investigated the matter, held a hearing and made a recommendation; in cases where an excessive force complaint is sustained, a nine-month to five-year delay occurred between the incident and the CCRB recommendation; and, the District was placed on notice of the huge backlog of cases in the CCRB by a the CCRB's yearly budget requests, by a December 1987 CCRB report, and by local newspaper articles detailing CCRB's chronic problems. As a consequence, failure to take effective measures to deal with the "continuing and obvious problems of the CCRB," Plaintiff's Memo, at 18, constituted a policy of deliberate indifference on the part of the District.

The District of Columbia places a different interpretation on the uncontroverted facts. In disputing the existence of a policy or custom that rises to the level of deliberate indifference, the District readily concedes that delays at the CCRB occurred. Defendant District of Columbia's Reply to Plaintiff's Proposed Findings of Fact and Conclusions of Law and Plaintiff's Evidence ("Defendant's Reply"), at 16. Nonetheless, the District maintains that the facts simply do not rise to the level of deliberate indifference. Specifically, the District contends that unlike the caselaw upon which he relies, Cox can show no evidence of a pattern of police misconduct or municipal indifference to misconduct. In fact, the District argues that the very figures upon which Cox relies, the funding and personnel figures in the CCRB from 1982 through 1992, disclose that instead of exhibiting indifference to the problem of police misconduct, the District "steadily increased the resources available to the CCRB." Defendant's Reply, at 22. In 1982, the CCRB's initial budget in 1982 was $150,000, and in addition to the seven-member board, the CCRB had a staff of five. In 1986, the staff had increased to nine and the budget was $378,000. By 1990, the budget was $805,000 and the staff was comprised of nineteen people.

Thus, although the facts before the Court are essentially uncontroverted, diametric conclusions have been drawn by the litigants. However, the statistics regarding the CCRB's complaint process, the evidence of Goodwin's misconduct, and the annual budget requests yield but one conclusion—the District of Columbia's maintenance of a patently inadequate system of investigation of excessive force complaints constitutes a custom or practice of deliberate indifference to the rights of persons who come in contact with District police officers. In this case the District of Columbia has allowed the "known hazardous risk" of failing to conduct timely investigations of allegations of police excessive force to continue over a protracted period of time without taking significant steps to alleviate that known and obvious risk. *See Morgan*, 824 F.2d at 1058.

Interestingly, this Circuit has once before been presented with a claim similar to the instant one, however, that case reached an outcome strikingly different. In *Carter v. District of Columbia*, 795 F.2d 116 (D.C.Cir.

1986), several plaintiffs claimed that the MPD had a practice of failing to train, supervise, investigate, and discipline officers that resulted in alleged constitutional injury to plaintiffs. *Id.* at 121. Nonetheless, at the conclusion of trial, the district court entered a directed verdict for defendants "because it found the evidence insufficient to prove that a municipal policy or established custom of deliberate indifference to police misconduct caused plaintiffs to be subjected to a deprivation of constitutional dimension." *Id.* at 122. Subsequently, the Court of Appeals upheld that directed verdict on grounds the District urges this Court to adopt here.

Here, however, the District's invocation of *Carter* and its parallel assertion that *Carter* controls the outcome of this case are unavailing. As is shown, the evidence introduced by Cox to support his theory of liability is much more finely honed than that adduced in *Carter*, and as a consequence, Cox has firmly demonstrated a pattern on the part of the District of maintaining a complaint and disciplinary procedure so ineffective as to virtually constitute a nullity, and, at the very least, deliberate indifference. The seeming similarities between the two cases are readily distinguished.

For example, the plaintiffs in *Carter* introduced complaints, pleadings and press clippings concerning use of excessive force and some testimony of "actual occurrences" of excessive force in order to establish municipal liability. *Id.* at 123. However, the Court of Appeals noted that the hearsay items such as the press clippings could be used only to show "notice to the city that allegations had been made." *Id.* Furthermore, after examining the testimony regarding specific instances of misconduct, the Court in *Carter* concluded that those occurrences were "scattered and do not coalesce into a discernible 'policy.'" *Id.* Nonetheless, the Court cautioned that despite giving little weight to the testimony of those plaintiffs concerning specific instances of misconduct, no numerical standard

controls the determination whether incidents of wrongful behavior cumulatively show a pattern amounting to a custom or policy. Egregious instances of misconduct,

relatively few in number but following a common design, may support an inference that the instances would not occur but for municipal tolerance of the practice in question.

*Id.*

In addition, the plaintiffs in *Carter* introduced limited statistical evidence in their effort to show that "complaints of police brutality would languish at the MPD, so that officers could act in derogation of constitutional rights without fear of sanction." *Id.* That limited evidence was criticized by the Court of Appeals, which concluded that "[p]laintiffs' statistics ... were too general to prove any pattern or policy, and their specific instances were too scattered and lacking in detail to build a case." *Id.* at 124. In *Carter*, plaintiffs apparently offered only three types of statistics: first, they stated that officers were exonerated in 92% of police misconduct investigations from 1974 to 1979; second, in 1983, the MPD Service Weapon Review Board cited twenty-six officers, yet the police chief took adverse action against only one; and third, of twenty-one cases in which the CCRB recommended adverse action, only five cases actually received adverse action from the police chief. According to the Court of Appeals, the difficulty with these statistics was that the first category lumped together all investigations, saying nothing about excessive force complaints, the second also said nothing about the type of case that involved use of a weapon, and any adverse inferences from the third category were convincingly rebutted by the Chief of Police's testimony that the dearth of necessary evidence and proof in these cases, in his estimation, did not permit him to sustain the CCRB's recommendations. *Id.* at 125.

In contrast to the lack of detail contained in the statistics and the insufficiency of the evidence introduced in *Carter*, Cox has demonstrated in the instant case that the District of Columbia did maintain, and indeed advance, a custom of egregiously delayed investigations. First, with only a very few exceptions, the CCRB is the exclusive receptacle for citizen complaints. Therefore, if the District wishes to retain its ability to terminate an unsatisfactory probationary police officer

(presumably the District of Columbia would determine whether officers using excessive force should be deemed unsatisfactory), the MPD must receive prompt investigations by the CCRB. An officer is only on probation for one year—a complaint filed while the officer is on probation but not resolved for two or three years or more is unquestionably useless. Without *prompt* investigations and *prompt* recommendations by the CCRB, the probationary officer's misconduct will not be evaluated timely with his or her other conduct, good or ill, and a valueless decision will be made to retain that officer. The CCRB's inability to timely resolve citizen complaints mandates that result. Moreover, the same problem exists for officers who have survived probation. If an officer uses excessive force and receives a complaint to that effect, as a general matter, no one within the MPD will know of the incident for literally years, permitting that officer to continue working unimpeded by discipline.[13] In sum, the MPD's hands are effectively tied—it is rendered powerless to take adverse action against renegade police officers unless and until the CCRB completes its investigation and makes a recommendation.

The case of Goodwin could not be more illustrative of the quandary faced by the MPD. Here, Goodwin received a complaint over two months before he was taken off probation, yet no one in the MPD was offi-cially confronted with the possibility there might be a problem with this police officer's actions towards persons in the District of Columbia. In good faith, Goodwin's supervisors recommended that he be retained. The system simply did not permit any other recommendation. In this case, assuming *arguendo* that the CCRB will someday investigate whether Goodwin used excessive force against Heitner in September 1989, the MPD has been thwarted from taking any appropriate action because, by its own admission, the CCRB did not send a letter to Heitner (presumably in order to investigate his allegations) until *thirty-six* months after the complaint was filed.[14] Had the District complied with its own law, it should have, at the very least, held a hearing in September 1989 before Goodwin's probation expired. Instead, it allowed this officer with serious accusations pending (and continuing to pend indefinitely) to serve as a District police officer.

 The CCRB's consistent and utter failure to abide by statutory deadlines for hearing cases has become a custom of deliberate indifference to citizen complaints of excessive force. Although the CCRB is mandated to schedule a hearing within thirty days of a citizen complaint, that requirement has been virtually ignored since promulgation in 1982. Cox has presented extremely detailed statistical evidence in support of this finding.[15] For instance, even at the CCRB's

---

**13.** Another troubling aspect of the CCRB is that if the CCRB believes that there is any probability of criminal misconduct, the complaint must be referred to the United States Attorney's Office and the CCRB is automatically divested of jurisdiction over that complaint. Unfortunately, it appears that no one in the MPD is ever advised of the CCRB's conclusion that one of its officers may have committed a crime. Accordingly, that officer remains in his or her job while the criminal investigation is pending and no one at MPD is any the wiser. If the MPD were at least notified of the referral and the reasons for that referral, it could make the appropriate administrative decision whether to permit that officer to continue in his or her present job or transfer the officer to a job which does not require contact with the public or place the officer on administrative leave.

**14.** Although the CCRB states that it attempted unsuccessfully to locate Heitner in August 1992 (during the pendency of these proceedings) and regardless of the efficacy of the procedures used to locate Heitner (plaintiff was able to locate Heitner and obtain an affidavit from him), it still took the CCRB thirty-six months before initiating even this action. It is not surprising that three years after his complaint was filed, Heitner would leave the area without giving the CCRB his forwarding address. After thirty-six months of inaction, a reasonable person might conclude that no action was forthcoming.

**15.** Cox has presented an entirely different type of statistics then those introduced by the plaintiffs in *Carter.* In contrast to the three unconnected categories of statistics adduced there, the statistics in this case provide logical support for the policy of delay alleged. Statistical evidence showing the growing number of CCRB complaints filed compared to the relatively static number of complaints heard and the corresponding expanding length of time before a complaint is resolved demonstrate convincingly that the District of Columbia had a custom or pattern of delayed investigations of police misconduct.

inception, in fiscal year 1983, the average time between the filing of a complaint and the receipt by the MPD of a decision on the merits was eight months, not thirty days as is required by District of Columbia law. Incredibly, that average kept climbing, peaking in 1990 at 33.1 months.[16] The CCRB has not even approached the statutorily required thirty-day period.[17] Hence, the body charged with the responsibility to address possible violations of the law itself continued to violate the law over and over again.

In addition to the CCRB's flagrant record of noncompliance with D.C.Code § 4–905,[18] the CCRB had a shockingly large backlog of cases remaining in administrative limbo literally for years. At the end of 1987, after it had been in existence for five years, the CCRB had a backlog of over 1,000 cases. Moreover, with the passing of each subsequent year, an additional 350 to 500 complaints were filed. Nevertheless, the CCRB actually heard only 40 to 60 cases each year. Although additional numbers were dismissed outright pursuant to the policy implemented in 1987 to dismiss cases in which the complainant had moved away, lost interest or died, that policy is itself damning. Since a huge number of complaints languished in the CCRB for years, unexamined and undetermined, it should not be surprising that many complainants moved away, died or lost faith in the CCRB process. Dismissal of these complaints is yet another result of the CCRB's mounting backlog of cases and failure to respond as directed by law. Heitner's complaint against Goodwin is most probative of the problem: Thirty-six months after the CCRB complaint was filed (from August 10, 1989 to August 10, 1992) and for the first time, a letter was sent to the address listed on Heitner's complaint.

Specific and unchallenged allegations of excessive force have occurred and remain uninvestigated. Heitner has submitted an affidavit describing an episode in which excessive force was used against him. As of September 10, 1992, no action has been taken on the complaint and the officers who allegedly violated the Constitution remain District of Columbia police officers. Even more revealing, the District of Columbia has presented no evidence, by affidavit or otherwise, to contest the sworn statements, affidavits and testimony contained in Cox's or Heitner's complaint. The evidence presented here demonstrates clearly that the District of Columbia had a custom—a given course of conduct so well-settled and permanent as to virtually constitute law—of not investigating citizen complaints against MPD police officers.

Indeed, the instant case is more similar to *Harris v. City of Pagedale*, than it is to *Carter*. In *Harris*, the plaintiff claimed that city officials were deliberately indifferent over the years to a known pattern of unconstitutional actions by city police officers; in other words, the city had a municipal custom of failing to investigate or take action on citizen complaints. 821 F.2d at 500. The Eighth Circuit held that in order to prevail, plaintiff would need "to show that City officials had notice of prior incidents of police misconduct and had deliberately failed to act on this knowledge." *Id.* at 504. That Court of Appeals upheld a jury verdict in favor of plaintiff based on evidence that, on repeated occasions, city officials in positions of authority were notified of offensive acts but failed to take any remedial action. *Id.* at 506.

Here, too, the District was repeatedly notified that the CCRB was effectively not functioning. The District implicitly recognizes the importance of notice by arguing that

---

16. In 1989, when Heitner's complaint was filed, that average was 28.6 months.

17. Statistics can be introduced and considered as evidence of liability if they are sufficiently detailed and/or responsive to the questions at issue. *See, e.g., Morgan*, 824 F.2d at 1061 (both raw statistics of steady overcrowding of a jail and testimony regarding incidence of violence demonstrated the District's liability).

18. Section 4–903(b)(2) has not been followed either. That section required the CCRB to promulgate rules and procedures which will ensure the adjudication of complaints and forwarding of findings to the Chief of Police "in an expeditious manner." Whatever internal rules and procedures existed at the CCRB, they clearly did not ensure expeditious handling of citizen complaints.

newspaper articles reporting the huge backlog of cases in the CCRB cannot be introduced as evidence relevant to this case. Naturally, as this Court of Appeals has stated, hearsay items such as newspaper articles "could show no more than notice to the city that allegations had been made," *Carter*, 795 F.2d at 123, however, these articles were notice to the District that numerous allegations had been made. Further, the rising number of complaints filed with the CCRB should have alerted the District to the problems endemic in the CCRB as it was then comprised. As the Second Circuit stated,

> the evidence that a number of claims of police brutality had been made by other persons against the City, together with evidence as to the City's treatment of these claims, was relevant. Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force.

*Fiacco*, 783 F.2d at 328. Evidence of the rising number of claims and the greatly increasing length of time the CCRB took to resolve those complaints convincingly contradicts the District's claim that it had no policy of deliberate indifference to the use of excessive force. "[I]f the [District's] efforts to evaluate the claims [or excessive force] were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim, such an attitude would bespeak an indifference to the rights asserted in those claims." *Id.* Thus, "[p]roof that other claims were met with indifference for their truth may be one way of satisfying the plaintiff's burden." *Id.* Highlighting the District's policy of indifference, Cox presented startling and disturbing statistics showing that nine-month to five year delays occurred before resolution of many CCRB complaints. In addition, Cox has introduced evidence of another individual who has filed an excessive

force claim implicating Goodwin, which also languished indefinitely.

The potentialities of this custom should have been apparent to the District of Columbia even if only based on the CCRB's continuing requests for additional staff and funding. In these requests, the CCRB frequently noted the intolerable backlog of cases as the basis for its requests. Moreover, the budget application requests did not contain solely monetary requests, they requested legislative action which would also decrease the backlog.[19] In sum, "[t]he requisite showing is satisfied by demonstration that the deliberate indifference is a persistent and widespread practice or course of action that characteristically was repeated under like circumstances." *Morgan*, 824 F.2d at 1058. Here, the need for investigation of excessive force claims was so obvious that the District of Columbia's failure to correct this known problem constituted deliberate indifference to the need.

### B. Causation

■ Once a municipal policy or custom has been established, causation, often an even more difficult hurdle, must be spanned. The plaintiff must prove that there is "a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. at 385, 109 S.Ct. at 1202. In other words, the policy must be the "moving force" behind the alleged constitutional violation. *Oklahoma City v. Tuttle*, 471 U.S. 808, 820, 105 S.Ct. 2427, 2434, 85 L.Ed.2d 791 (1985); *see Parker v. District of Columbia*, 850 F.2d 708, 714 (D.C.Cir.1988), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1339, 103 L.Ed.2d 809 (1989). But, as the Supreme Court so aptly noted, "[t]he inquiry is a difficult one; one that has left this Court deeply divided in a series of cases that have followed *Monell*." *Harris*, 489 U.S. at 385, 109 S.Ct. at 1202.

---

**19.** By describing the CCRB's budget requests, the Court does not suggest that a particular sum of money should have been or should now be appropriated to address citizen complaints of excessive force. Certainly other non-monetary alternatives could have been implemented to redress the chronic backlog of complaints at the CCRB. The proposed legislative action is just one example of an alternative. Other actions such as prioritizing complaints or earlier implementation of the EWTS or a like system so that the MPD would be notified when an excessive force complaint is filed could also have been utilized. Providing the MPD with the tools to effectively evaluate its officers would not have been a difficult task.

In the search to describe causation, the various Courts of Appeals have articulated an assortment of phrases to describe the degree of causation necessary. In the District of Columbia, "substantial factor" is most often invoked. The policy will be considered the "moving force" behind the constitutional violation if the

> conduct is a substantial factor in bringing about harm.... The defendant may be held liable for harm that is "foreseeably attributable" to his conduct as well as for unforeseeable harm attributable to his conduct, unless it appears that the chain of events is "highly extraordinary in retrospect."

*Parker,* 850 F.2d at 714 (quoting *Morgan,* 824 F.2d at 1062–63). Or, as the Third Circuit explains, causation may be shown by a "plausible nexus" or an "affirmative link" between the constitutional injury suffered and the municipal practice. *Bielevicz,* 915 F.2d at 850. "A sufficiently close causal link between ... a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." *Spell v. McDaniel,* 824 F.2d 1380, 1391 (4th Cir. 1987), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988); *accord Bielevicz,* 915 F.2d at 851. Either actual or constructive knowledge of the existence of the custom combined with the municipality's failure to correct or to stop the practice, either as a matter of intent or deliberate indifference, can constitute municipal fault. Constructive knowledge "may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these." *Spell,* 824 F.2d at 1391.

In this case, causation exists. Although the second is essentially a broader version of the first, Cox has set forth two separate theories of causation. First, he states that had the District possessed a functional system of discipline, Goodwin would have been removed from service before the incident between Cox and Goodwin occurred on December 30, 1990. Alternatively, Cox argues that the District's policy of delayed investigation and discipline encouraged police misconduct because the officers knew that punishment might not occur at all or if at all, only at some remote future time.

Plaintiff's first theory of causation is based on the premise that had the CCRB timely investigated Heitner's complaint against Goodwin, it would have sustained Heitner's excessive force claims and Goodwin would have been terminated during his probationary period. The District asserted, however, that this argument is "speculative" since there has been no investigation into Heitner's complaint. That argument is counterclockwise. Stated otherwise, the District argues that Cox cannot demonstrate that chronic delays at the CCRB caused his constitutional injury because a complaint alleging excessive force filed over *thirty-six months* before any investigation was even initiated, has not yet been seriously investigated or resolved. Thus, bootstrapping its very failure to investigate Heitner's complaint of excessive force, the District would avoid liability for failing to investigate complaints of excessive force. That result simply is indefensible; causation cannot be so easily circumvented. Faced with the uncontested[20] and sworn allegation that Goodwin used excessive force against Heitner during his probationary term, and coupled with the fact that the MPD *must* terminate probationary employees deemed

---

20. The District claims that Cox's theory that Goodwin would have been removed had a functional system of discipline existed in 1989 and 1990 is "based on speculation unsupported by any testimony to the effect that Officer Goodwin's conduct, either during or after his probationary period on the MPD, should have resulted in removal from the force." Defendant's Reply, at 14. That statement is incorrect. Although Cox's theory is not based on unsupported speculation, the District's contrary conclusion is. There is no testimony from Goodwin or from any other MPD official to contradict Heitner's allegations that excessive force was used. Nor is there any evidence from which one could conclude that notwithstanding a violation of the Constitution, Goodwin would have been permitted to continue his MPD employment. During 1988 and 1989, this termination requirement was regularly enforced based on information possessed by the MPD. Thus, the only reasonable inference from Heitner's sworn uncontested statement is precisely the opposite—Goodwin would have most likely been terminated.

unsatisfactory, the Court can only conclude that had the CCRB investigated and resolved Heitner's complaint within the statutory framework, Goodwin would have most likely been terminated and the incident involving Cox could then not have occurred.

■ Moreover, although Cox has not demonstrated that delays at the CCRB actually encouraged additional misconduct or excessive force violations, the CCRB's patent inadequacies certainly did permit serious misconduct to go unchecked. In that sense, the District's policy "caused" or was a "substantial factor" in Cox's injuries.[21] Logically, "continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future." *Bielevicz*, 915 F.2d at 851.[22]

There clearly existed an inadequate system of discipline and the District knew or should have known that system would cause injury. As illustration, the District of Columbia knew there was a problem of police misconduct and they decided that they needed "a formal mechanism for public participation and public review of allegations of misconduct which undermine community respect for and cooperation with the police." *See* Stipulation, ¶ 4. The District's determination that a hearing should be scheduled within thirty days bespoke its acknowledgement that prompt resolution of citizen complaints was a necessity. The District of Columbia knew from the information contained in the CCRB's budget requests, from the newspaper articles and from a comparison of the huge number of complaints filed and the few number of complaints actually heard each year, that year after year, the CCRB did not operate as it was directed to do. Yet, the District of Columbia did nothing significant to correct the flagrant and intolerable backlog at the CCRB.

Because this systematic backlog of complaints was permitted to exist, it took years before any substantive determination was made on most citizen complaints, whether the complaint charged improper language or excessive force. Accordingly, those officers whose conduct was unsatisfactory and who did abuse the authority of their position could continue working for an indefinite time without adverse consequences. Because the Act essentially divests the MPD of any jurisdiction over civilian complaints, and the CCRB consistently delayed action on those complaints, effective oversight of unsatisfactory officers was irretrievably lost. While it is obviously beneficial to have a body other than the MPD investigate allegations of police misconduct, the problem is the impotent functioning by the system chosen for this purpose and the District of Columbia's deliberate indifference to that impotent functioning.

■ That this custom actually *caused* Cox's injury is clear. Causation is established "if occurrence of the specific violation was made "reasonably probable" by permitted continuation of the custom." *Spell*, 824 F.2d at 1391. Cox was brutally assaulted on December 30, 1990 by an officer who had already received an excessive force complaint one year earlier. During that year, between the first CCRB complaint against Goodwin and the subsequent assault on Cox, no action was taken—the complaint was not even preliminarily investigated for three years. Moreover, this one incident is not extraordinary, but illustrative of the failures endemic at the CCRB—the "widespread extent of the [CCRB] practices," *id.*, from which constructive knowledge may be inferred. By no means is it "highly extraordinary in retrospect" that a pattern of uninvestigated com-

21. The fact that there have been two complaints not containing excessive force since the Cox incident does not signify that Goodwin's behavior after December 30, 1990 was commendable or prove that the CCRB functions effectively. *See* Defendant's Reply, at 11–13. Simply stated, this argument is specious.

22. As Inspector Soulsby aptly stated, for discipline to be effective, it must be timely. Moreover, one can conclude, without recourse to ex-

pert testimony, that discipline must occur in a timely manner for it to retain its effectiveness. Nor is it necessary to determine exactly what is timely. Suffice it to say, discipline two to four years after an incident of misconduct cannot be considered timely or effective in preventing like instances of misconduct. It is evident that delay in discipline will do nothing to prevent reoccurrences of misconduct during the years a complaint pends in the CCRB.

plaints of excessive force would result in further incidents of excessive force.

In conclusion, the failure of the District of Columbia's Civilian Complaint Review Board to perform its mandate constituted deliberate indifference to the constitutional rights of James Douglas Cox with whom the District of Columbia police came into injurious confrontation on December 30, 1990. The District of Columbia made a conscious choice to close its eyes and cover its ears to the clamor of the complaints of police brutality languishing before its Board. This choice caused complaints filed with the CCRB to be nothing more than nullities. The municipality has recognized the dangerous ineffectualness of the Board it established, yet has provided minimal action to correct the serious and escalating situation. The District of Columbia cannot expect, and does not deserve, immunity from the foreseeable injuries caused by its deliberate indifference.

### III. CONCLUSION

Accordingly, for the reasons stated above, it is hereby

ORDERED that summary judgment is granted on the accompanying judgment page in favor of plaintiff, James Douglas Cox and against defendant, the District of Columbia; it is

FURTHER ORDERED that because the parties did not provide the Court with information regarding damages, there shall be an evidentiary hearing on May 21, 1993 at 10:00 a.m. to determine damages.

IT IS SO ORDERED.

### ORDER

In consideration of the Memorandum Opinion and Order issued April 26, 1993 and the findings of fact and conclusions of law recounted on the record this date, all of which are fully adopted herein, it is hereby

ORDERED that judgment is entered in favor of James Douglas Cox and against the District of Columbia in the amount of $65,-000.00 (sixty-five thousand dollars), including interest until payment at the prevailing interest rate; it is

FURTHER ORDERED that plaintiff's request for attorney's fees and costs shall be filed on or before June 11, 1993. The District's opposition, if any, shall be submitted on or before June 25, 1993 and the reply, if any, is due on July 2, 1993; it is

FURTHER ORDERED that plaintiff is entitled to the return of the $2,000.00 (two thousand dollars) bond posted with the Clerk of the United States District Court for the District of Columbia.

IT IS SO ORDERED.